J. C. RAINES, WILL RAINES, THEO. W. RAINES, H. E. CONSTANT ET AL. v. MRS. MARY D. OSBORNE, EXECUTRIX OF THE WILL OF MRS. FANNY J. RICKS, DECEASED.

(Filed 13 December, 1922.)

1. **Appeal and Error—Record—Instructions—Presumptions.**

    Where the record on appeal does not set out the charge of the trial judge to the jury, and no exception thereto appears therein to have been made, it will be presumed that it was in all respects correct, and that the jury were properly instructed as to the law.

2. **Wills—Interpretation—Servants—Employees—"Household."**

    A bequest "to any servant or other household employee who may be in my (the testatrix's) employment at the time of my death," is construed to imply the words "household" between the word "any" and the word "servant"; and one employed around the house, sleeping in a servant's room on the premises, eating in the servants' quarters, and hired to cut and bring in wood, for use in the testatrix's dwelling, and to take care of the testatrix's greenhouse, to cut the grass on her lawn, to dust her rugs, etc., is within the intent and meaning of the words "domestic servant." This interpretation is illustrated by a specific devise in another item of the will to one employed as a companion by the testatrix, living as a member of her household, and whose duty was not that of a servant, the testatrix not intending to call her a servant, and therefore using the words "household employee" to spare her feelings, although she performed in some respects a servant's work.

3. **Appeal and Error—Objections and Exceptions—Questions and Answers —Evidence—Objectionable in Part.**

    An objection and exception to a proper question asked a witness does not necessarily include the answer of the witness, and where the answer is competent in part, exception should be taken specifically to the erroneous part in order that it may be considered on appeal, and not merely to the question, which is competent and in proper form, but only to the incompetent part of the answer.

APPEAL by defendant from *Lane, J.,* at Fall Term, 1922, of POLK.

This is an action for the recovery of certain legacies alleged by the plaintiffs to be theirs under and by virtue of the will of Mrs. Fanny Jones Ricks.

After the disposition of a large sum in pecuniary legacies to friends and relatives, the material portions of the will required to be considered in this case are as follows:

"Item 7.   To Lizzie Burkhardt, $1,000."

"Item 11.   To any servant, or any other household employee who may have been in my employment for five consecutive years before my death, and not otherwise particularly mentioned by name in this will, or any codicil thereto, the sum of $250 each, and if any such employee shall have been in my service for more than five years, then $50 shall be added for each additional year over five years.

"Item 12.   To any servant or other household employee who may be in my employment at the time of my death I give and bequeath a sum equal to six months' salary, and this clause shall be effective whether such person benefits under any other clause of my will, or any codicil thereto, or not."

The following testimony was introduced, so far as it relates to the question raised in the defendant's appeal:

Mrs. Lum Newman testified: "My maiden name was Maud Constant.   I am a sister of H. E. Constant.   I knew Mrs. Fanny Ricks for about a year and a half before she died; she lived at Rickshaven on Tryon Mountain in said county; I worked for her about nine months; was in her household longer than that, but did not work for her all the time.   I was working for her when she died, 2 November, 1918; I was a house maid and worked in the house.   My brother, H. E. Constant, was working at Mrs. Ricks' part of the time I was there; he was there at the time of her death; he started to work for her about the middle of the summer and he slept in a little house out in the yard.   She slept in the large house and this little house had a garage in it and the chauffeur slept there before H. E. Constant came; it was a servant's house.   While in Mrs. Ricks' employ my brother slopped the swine and fed and watered the cows and helped me milk, and milked sometimes by himself, and when he was not there I milked myself; he cut up wood and helped dust the rugs in Mrs. Ricks' large house, and she had chores for him in the yard.   Mrs. Ricks lived in the little house once when I stayed there and rented the large house as a boarding house, and when the guests left she moved back to the big house; one of the rugs was very large and a lady person could not handle it; my brother helped move the furniture when Mrs. Ricks went back to the large house; he helped gather the fruit and put it where we could get it, and put some in the

basement; she had right much fruit stored in the basement that we sold after she died. He raked the lawn, mowed the grass, and helped take care of the pea hay and soybeans, and such as that, and worked around the barn and raked it, and kept the barn nice all the time; just did chores around the house and wherever she told him to. He ate on the porch in between her large house and the small one, and he worked in the hothouse a great deal, where the flowers were kept. The porch I spoke of was the servants' dining-room. I ate with Mrs. Ricks' white cook part of the time, and part of the time I ate out there on the porch."

Govan Constant testified: "I am the father of Ewart Constant. He worked for Mrs. Ricks at three different times; the last time was in July, 1918. I was up at the place several times while he was working there and I saw him taking the slop from the kitchen and cutting wood and working in the flower beds next to the kitchen, and putting fruit in the basement, and watering the pretties, the flowers; they had a wind-mill to get water to them. I was there one night and my son slept in Mrs. Ricks' house and used her bedclothes, for I slept with him. It was the little house she first lived in before the big house was finished; the big house was thirty or forty feet away. I saw him hunting the cattle."

"Q. Did you have a conversation with Mrs. Ricks in regard to your son?" Objection; overruled; exception.

"A. Yes, I asked her how she liked Ewart and she said he done very well, that he was highstrung, but was learning fast, and that she would give him more as he learned, and that if he suited her and stayed to her death there would be something there for him."

"The conversation I spoke of with Mrs. Ricks was in the fall before she died; she sent for me to come, and I went to see her. Mrs. Ricks had some women at work at the house; Emma Forrest was cook and Maud Constant was the maid, and Miss Lizzie Burkhardt lived with her; she also had on her farm cattle, sheep and goats; my son tended to those near the house; I don't know who did it at the barn. H. E. Constant did not have any house or garden up there, nothing but himself; I never saw him working in the field, but he kept the barn clean and worked in the garden and there around the house, and turned the cattle out and went for them at night."

Claud Constant testified: "I am a brother of Ewart Constant. I knew when he hired to Mrs. Ricks and when he quit. I was right there at her house when he hired to her in July. She told me she would give him $24 a month and board and laundry, and that she figured the board and laundry as close as she could, and that it would be $20, making $44 per month. I was there a couple of times after this before she died, and saw my brother gathering the fruit and putting it in the basement,

pulling weeds out of the flowers and feeding swine and cows, and milking the cows, and making a walkway around the door; he slept in the house about forty feet from the big house."

There also was testimony that Miss Lizzie Burkhardt lived with Mrs. Ricks as her house companion, and assisted in the house work or domestic duties. Mrs. Ricks had been heard to call Miss Burkhardt her house companion.

In this appeal the record shows that the jury returned the following verdict upon the issues submitted by the court:

"1. Is the plaintiff, H. E. Constant, entitled to participate under section 12 of the will of Mrs. F. J. Ricks? Answer: 'Yes.'

"2. What monthly salary was H. E. Constant receiving under his contract with Mrs. Ricks? Answer: '$44 per month.' "

Judgment was entered upon the verdict, and defendant appealed.

*Shipman & Arledge for plaintiffs, appellees.*
*R. M. Robinson for defendant, appellant.*

WALKER, J., after stating the case: The charge of the judge is not in the record, and, therefore, we may conclude that it was satisfactory to the defendant, as there was no exception to it, so far as appears. We also may assume that it was in all respects correct, and that the jury was properly and fully instructed as to the law. This being so, the only question before us seems to be whether there was any evidence for the jury that the plaintiff in this appeal was such a servant or employee as entitled him to a legacy under the will.

We are necessarily called upon to construe the will of Mrs. Ricks, and especially item 12, under which plaintiff claims the legacy awarded to him by the verdict of the jury and the judgment of the court. That item reads as follows: "To any servant or other household employee who may be in my employment at the time of my death, I give and bequeath a sum equal to six months salary, and this clause shall be effective whether such person benefits under any other clause of my will, or any codicil thereto, or not." What did the testatrix mean by the use of the words "To any servant or other household employee"? And to arrive at this meaning we must clearly understand the relation of the testatrix to those who were members of her household. It is not disputed, but agreed, that Miss Lizzie Burkhardt, to whom a legacy was given by item 7 of the will, and who is frequently mentioned in the record and briefs of counsel, was not in the strict sense of the word a mere servant, whether that word be used in its legal or technical or in its popular sense, or as used in common parlance, but she was Mrs. Ricks' friend and companion, and while she may have regularly per-

formed some of the duties and chores of a servant, or even those of a menial kind, she yet was regarded and treated by Mrs. Ricks as socially her equal, and in this way and for this reason, she sought, and for a long time enjoyed, her companionship. Notwithstanding the fact that Miss Burkhardt also was employed to perform, and she did perform, various and sundry duties in and about the house, as an ordinary domestic servant would do, knowing the domestic life of these women as we do, and how they stood toward each other, and were regarded by each other, we can well understand why Mrs. Ricks resorted to the use of the words "or other household employee," and in connection with the preceding words "To any servant," as her object is manifest. She wished to favor her friend and daily companion by giving her a part of her large estate, but she wished also to avoid placing her in the attitude towards herself as an ordinary domestic servant. Her intention was, to be sure, that Miss Burkhardt should be rewarded for her faithful service and companionship, but, at the same time, to spare her feelings by excluding any, even the slightest suggestion, that she was to be regarded as a servant rather than as her friend and social equal, though performing some of the duties of a servant in the household. Therefore, it was that the word "employee" was used in contradistinction to the word "servant." Miss Burkhardt was brought into her home, not as a servant, but as a companion and associate, and not as a menial, though she may have made herself useful in other respects by attending to many of the duties of the household which servants generally perform.

The expression "To any servant or other household employee," with the above explanation, means the same thing as if it had read, "To any household servant or other household employee, etc., I give and bequeath," the word "household" being clearly implied in the first part of the sentence as it is clearly expressed in the last. The very construction of the sentence shows this without any doubt, and that it was intended is plainly established even by the item itself, even considered apart from the other portions of the will but in the light of the evidence and admitted facts.

But it is sufficient to say that the use of the word "other" was manifestly intended to describe one who was employed in the household, but not the same as or identical with, but different from a servant, who had been specified; not in the same class, though at times and on occasions doing household work of a like or even the same kind. The term "employee" was a milder type of expression, which more nearly and distinctly characterized the position held by Miss Burkhardt. But the words "other household" unfold the whole meaning of the item, for they unmistakably apply as well to the preceding word "servant" as they do to the word "employee," so that the gift, according to the natural and

RAINES *v.* OSBORNE.

obvious interpretation of the language, is and must be to "any household servant or other household employee," and as if it had been so expressly framed by the testatrix.

In 28 R. C. L., sec. 186, the proper rule of construction to be applied to a phrase of this sort is stated as follows: "A rule frequently applied in construing wills is that, where certain things are enumerated, and such enumeration is followed or coupled with a more general description, such general description is commonly understood to cover only things *ejusdem generis* with the particular things mentioned. In such cases it is presumed that the testator had only things of that class in mind. The reason for the rule is that the adoption of the more comprehensive meaning would have the effect of rendering the superadded expression nugatory and make the testator employ additional language without any additional meaning." If the words "other household employee" are not to be given the effect of imparting to the previous word "servant" the meaning of "household or domestic servant," we have a case in which the testator used such additional words without clearly indicating any additional meaning.

But while that is the rule, as contended by the defendant, and we have construed the will in accordance therewith, and not in the least departed from it, the plaintiff H. E. Constant's duties in and about the house were such as pertain largely to household work. The cutting and bringing in of wood, taking care of the greenhouse, watering the flowers, mowing the grass on the lawn and raking it, storing the fruit in the basement of the mansion, dusting rugs, milking cows on the lot, moving the carpet, and such other services as he performed were as much household duties, and were in some respects as necessary to the proper conduct and maintenance of the house and the convenience and comfort of its occupants or inmates as the services of the cook, maid, or other domestic servants or household employees. Besides this, plaintiff slept in the servants' house in the yard, ate in the servants' dining-room, and was in all respects as fully treated and recognized as a household servant as was the maid or the cook. We therefore think that the evidence was such as to warrant the court in submitting to the jury the question as to whether the plaintiff was embraced within the class of servants mentioned in item 12 of the will above quoted. We do not, therefore, hesitate to decide that the plaintiff has offered evidence sufficient to include him in the description of the persons who take legacies under item 12 of Mrs. Ricks' will, if the jury believed that evidence and found the facts accordingly, which it appears that they have done, by their verdict, and, also, we believe that he was in the mind and contemplation of the testatrix when she wrote that item of her will, as one of her household servants or employees.

The question asked the witness as to a conversation he had with Mrs. Ricks about his son was not in itself incompetent, as it was a natural inquiry for a father to make of the person who employed his son, and, at least, a part of the answer to it was competent. Where this is the case, the objection should also be made to the answer, and specifically to the objectionable part of it, otherwise, if any of the answer be competent, though a part may be incompetent, the objection fails. *S. v. Ledford,* 133 N. C., 714. It was there held that "A general objection to evidence will not be entertained if such evidence consists of several distinct parts, some of which are competent and some not competent." That decision has been since approved in numerous others by this Court.

This being our conclusion, there is no error in the case.