These proceedings were originated by the filing of petitions in the Orphans Court of Hunterdon County on behalf of Tristram Campbell, Ida Campbell and William F. Bronson in which each claimed and sought the recovery of a legacy under the tenth article of the last will and testament of one William Morgan Savin, deceased. The controversial issues were summarily heard and it was decreed that a legacy had been bequeathed by the testator to each petitioner and the executors were directed to pay the legacies, costs and specified counsel *Page 564 
fees. Asserting that the decree in all respects is erroneous, the executors now prosecute this appeal to annul the decree.
The will bears the date of April 27th, 1932, and the testator died on February 22d 1933. The paragraph of the testator's will from which the petitioners allegedly derive their claims is designated as "Article Tenth" and reads:
"To the household servants who, at the time of my death, are employed in my home at Annandale, New Jersey, or in my New York home, including my chauffeur, I give and bequeath the sum of Twenty-five Hundred ($2,500) dollars to each who, at the time of my death, has been so employed for five years or more, and to any who have been so employed for over two years and less than five years, I give and bequeath the sum of Five hundred ($500) dollars, for each completed year of service.
"Should either of said homes be closed at the time of my death, the servants who were employed therein at the time of closing such home shall be treated as though employed there at the time of my death."
The testator, William Morgan Savin, was evidently possessed of considerable wealth. He was formerly a member of a business firm known as Wilcox and Company. He never married and his relatives nearest in degree were two nieces. In addition to a home in New York City, he acquired and maintained until his death a country estate of about 100 acres at Annandale, Hunterdon County, New Jersey, where he resided each year from April until after the general election in November. The structures situate upon the property were the main dwelling house in which the testator was domiciled, a cottage in which the petitioners, Tristram Campbell and his wife, Ida Campbell, dwelt, a small building providing living quarters for a chauffeur and the usual farm outbuildings. The farm land was cultivated in part and live stock such as cattle and poultry were raised and maintained for domestic usefulness. The general farming was not a commercial pursuit. The produce was largely consumed by the testator, his guests and his employees. Besides the three petitioners, a maid and a cook were regularly employed.
In his will, the testator first makes generous provision for the maintenance and comfort of his two nieces. Next, he establishes a trust fund with directions to expend the income *Page 565 
"for the creation, maintenance, extension and development of a better knowledge and understanding between the people of Japan and China and the people of the United States." Then follow bequests to the children of his nieces and to certain persons who were presumably more distant relatives or personal friends. Having then in the first seven articles of his will bestowed benefactions upon his relatives and intimate friends, the testator contemplates rewarding those who had directly or indirectly served him and his interests. His attention obviously turns to those who were rendering services to the firm of which he had formerly been a member and in the welfare of which he evidently retained at least a personal interest. He appropriates $25,000 to be distributed among the employees of the firm in shares to be determined by the duration of their employment. Succeeding this is the bequest of $5,000 to Thomas Campbell employed at the farm, and the son of Tristram Campbell. Immediately ensues the bequests to the "household servants" who, at the time of his death, were "employed in my [his] home" at Annandale. Gifts to several welfare, charitable and religious institutions and associations precede the final disposition of the residue of the estate.
The evidence embodied in the transcript of the proceedings in the Orphans Court discloses that Tristram Campbell, counseled by his son, Thomas, was in truth the superintendent of the maintenance of the entire estate. Bronson, in a subordinate capacity, re-enforced Campbell. Mrs. Campbell was principally the laundress.
In examining the propriety of the decree, it is essential to ascertain from the evidence the service, if any, which each of these employees performed for the comfort, enjoyment and welfare of the testator in his household.
In the absence of the testator during the winter months, there were no servants in the dwelling and the keys were entrusted to Campbell. It was his duty frequently to inspect the mansion house and observe the condition of the house and its contents. He was expected to ventilate the house and, as occasion required, operate the furnace to remove the dampness. It was contemplated that he would make any necessary *Page 566 
repairs. He was obligated to care for the summer wearing apparel and other personal effects which the testator usually stored there. Immediately preceding the arrival of the testator in April, Campbell assumed the task of opening the shutters, installing the screens, cleaning the rugs and performing the more laborious work incident to the preparation of the house for occupancy. In all these undertakings, Bronson customarily assisted him.
During the season of testator's occupancy of the home, the more arduous household tasks such as the delivery of coal for the kitchen and wood for the fireplace, the removal of garbage, the mowing of the lawn, the purchase, in the village, of household articles, and the manufacture of ice cream by means of a manually operated freezer devolved upon Campbell and Bronson. These two men regularly supplied from the farm and delivered to the dwelling such provisions as milk, cream, poultry and vegetables.
Mrs. Campbell laundered not only the washable apparel of the testator but also the other household linens. The laundry appliances were located in the cottage in which Mr. and Mrs. Campbell resided. At times she substituted for the cook. It is significant that the testator maintained a telephone connection between the mansion house and this tenant house, the latter about 100 feet distant from the mansion house. Household requirements were frequently communicated to Campbell and his wife by this means, and when Mr. Campbell was not at hand, Mrs. Campbell would perform the chore, if within her ability. Upon the testator's departure in November, the duty to close securely the home rested upon these three permanent employees. All three continued these occupations until the testator's death, at which time Campbell had been so employed for fourteen consecutive years, Bronson for more than five years and Mrs. Campbell for more than two years. Moreover, it is noticed that at the time the testator executed his will in 1932, Mrs. Campbell, of the three, had been in his employ slightly more than two years and Bronson somewhat more than five years. The cook and the maid were ordinarily employed through an employment agency in New York and the two servants who were holding *Page 567 
these positions at the testator's death had served him only for a period of one year. The periods of service of the various cooks and maids were not lengthy. Indeed, within the three years preceding testator's death, three cooks and two maids had been successively employed.
The learned judge of the Orphans Court resolved that the services regularly performed by the three petitioners essentially concerned the testator's household and directly contributed to the comfort and pleasure of those living in it, and that in view of all the relevant circumstances, the petitioners were household servants within the class described in the tenth article of the will.
The fundamental question is not confined to the abstract question whether petitioners were household servants. It is the concrete question whether in the composition of this article of his will, the testator intended to reward these petitioners or only those in his employ who performed services solely within the house in which the testator himself resided.
In general, precedents are of a somewhat limited value in the solution of questions requiring the construction of provisions in wills, since each such provision ordinarily presents an individual problem. The effort is to discover the reasonably presumable intent and purpose of the testator. Not only the language employed in the clause of special pertinence but the entire will must be examined, especially the paragraphs preceding the one in question, to perceive, if possible, the path traveled by the mind of the testator on the way to the one to be construed. The surrounding circumstances are often illuminative. Moreover, a testator, in expressing his desires, does not always choose words with the precision of the lexicographers.
Nevertheless, words are the currency of thought, the tokens of exchange in the world of ideas. Perfection in understanding the written or spoken word is in direct proportion to the comprehension of the meaning of words. It is also to be observed that words in common usage increase and decrease in the scope of their significations and in the course of years they may be shorn of old meanings and acquire completely new ones. The result of this growth in the implications of *Page 568 
language is that a testator in 1650 and another in 1940 may have employed identical words and yet have intended to impart different or dissimilar ideas. It follows as a necessary precept in the interpretation of words of a will that, in the absence of evidence to the contrary, a court should ascribe to the words the meaning imputed to them at the time the testator adopted them.
Pursuing this conception, we find that the adjectives "household" and "domestic" are words of like import in current usage. "Domestic" is defined as "of or pertaining to the household or family," "belonging to the house or home," "pertaining to one's place of residence and to the family." "Household" is defined as "of or pertaining to the household, hence domestic," "belonging to the house or family, domestic."Webster's Universal Dictionary; Webster's CollegiateDictionary.
The phrase "domestic servants" or "household servants" has undergone a transitional change in meaning with the passage of years. It was once thought that the phrase distinguished indoor from outdoor servants, including the former and excluding the latter. Ogle v. Morgan (1852), 1 De G.M. G. 359;42 Eng. Rep. 590; Vaughan v. Booth (1852), 13 Eng. Law Eq. 351;16 Jur. 808; In re Drax (1887), 57 L.T.N.S. 475; In reOgilby (1903), 1 Ir. R. 525; Theobald on Wills (7th ed.)273; 2 Jarman on Wills (6th ed.) 1120; 1 Bouvier's LawDictionary (12th ed.) 498. Earlier, the language distinguished the words "domestic" and "servant." 1 Bouvier'sLaw Dictionary, supra. In more recent years, however, in the absence of a clear intent to the contrary, courts have construed the words to include all servants who labor on the residential property. In re Jackson (1923), 2 Ch. 365; 38 A.L.R. 763;Raines v. Osborne (1922), 184 N.C. 599; 114 S.E. Rep. 846,849; In re De Forest's Estate (1939), 15 N.Y.S. 2d 466;172 Misc. 515; Catto v. Plant (1927), 106 Conn. 236;137 Atl. Rep. 764. A more limited meaning has been imputed to the phrase when other words in the bequest or will denoted such limited meaning. Frazer v. Weld (1901), 177 Mass. 513;59 N.E. Rep. 118; Murphy v. Lawrence (1914), 218 Mass. 39;105 N.E. Rep. *Page 569 380; Lafring v. Whitney (1922), 233 N.Y. 107;134 N.E. Rep. 852; Givens v. Whitney (1922), 233 N.Y. 665;135 N.E. Rep. 961. A liberal construction was given to a more general phrase in Anderson v. Stone (1933), 281 Mass. 458;183 N.E. Rep. 841. The meaning of the word "home" was construed by Vice-Chancellor Buchanan in Chase National Bank v.Deichmiller (1930), 107 N.J. Eq. 379; 152 Atl. Rep. 697.
Examining these cases more studiously, the development of the meaning of the phrase becomes clearly apparent. In Ogle v.Morgan, supra, the Earl of Abergavenny bequeathed "to each person as a servant in my domestic establishment at the time of my decease a year's wages beyond what shall be due him or her for wages." The question litigated was whether the late earl's chief gardener came within the bequest. Vice-Chancellor Knight Bruce held that he was so included but upon appeal Lord Chancellor Truro reversed holding that the word "domestic" distinguished indoor and outdoor servants. Subsequently, English courts conceived that the Chancellor's ruling established the meaning of the phrase as a matter of law. Vaughan v. Booth, supra; In reDrax, supra; In re Ogilby, supra. However, in In re Jackson,supra, where the testator had made a bequest "to each of my domestic servants," his coachman, chauffeur and gardener claimed under the provision. The English Court of Chancery, each of three judges writing separate opinions, held that Ogle v. Morgan
does not lay down any fixed rule of law requiring the court to find that the phrase "domestic servants" excludes outdoor servants. It was resolved that each will must be construed of itself to ascertain the intent of the testator, that seventy years have witnessed a change in the meaning of "domestic servant" and that in the case before the court the testator used the phrase to distinguish those who labored on his estate from those who labored in his business and hence the claiming legatees were successful.
The construction in Frazer v. Weld, supra, was controlled by the testator's additional language. The bequest was "to each of the servants who at the time of my death shall have been in my employ at my homestead, or at the stable connected *Page 570 
therewith." The court conceded that the ordinary meaning of "homestead" is residential estate but if that had been the testator's meaning there would have been no necessity for adding "or at the stable connected therewith." In view of the language there chosen, it was inferred that the testator meant "dwelling house" and one who engaged in "plowing, chopping, mowing, working around the house" was not a legatee thereunder. Likewise, in the Massachusetts decision of Murphy v. Lawrence, supra, the phrase "domestic servants" was narrowly construed because of the fact that the immediately preceding paragraphs of the will when read with the one construed indicated that such narrow meaning was intended. But in Anderson v. Stone, supra, where the bequest was to "each person in my employ at my residence," the Massachusetts court held that a laundress who labored for a daily wage and lived off the estate was included, and the court pointed out that the words were comprehensive and must be liberally construed in the absence of a contrary intention appearing in the will.
The New York cases of Lafring and Givens v. Whitney arose out of the same will. The gift was "to each person * * * customarily employed as part of my household in my house"
(italics mine). The court held that the latter phrase limited the gift to those employed in the house and hence an outside watchman and an electrician were not recipients of the testator's bounty. Therefore, when the gift was "to each household servant in our employ," Surrogate Howell said that the Lafring decision was controlled by its own peculiar phraseology and that under the will before him a servant who lived with his wife in a cottage furnished to him on the estate, provided table board for three other estate employees, spent seventy-five per cent. of his time working with a truck, the balance spent gardening, carting wood to the house and removing the trunks at the seasonal exodus and ingress was a "household servant" under the will. In re DeForest's Estate, supra.
In Catto v. Plant, supra, the bequest construed was "to each of my domestic servants." A gardener living in a cottage on the estate's grounds was allowed to recover a legacy under *Page 571 
that provision. That court said at page 766 of the unofficial report:
"Without, of course, attempting to formulate a definition which would be applicable to all cases, we think it may be said that ordinarily a domestic servant is one whose service is connected with the maintenance of the house and land connected with it and constituting the establishment of his employer in such a way that his work and duties, whether in or outside the house, have to do with the running of the establishment or estate in providing for and ministering to the wants and comforts of the members of his employer's household."
In Raines v. Osborne, supra, the gift was "to any servant or other household employee." The court held that the jury had properly found that one whose duties consisted of cutting and bringing in wood, taking care of greenhouses, watering flowers, mowing and raking lawns, storing fruit in the basement, dusting rugs and milking cows was a household servant or employee within the terms of the bequest.
This survey of the law is persuasive that the meaning of the phrase "household servants" is not definitely delineated by a fixed principle to be universally applied and that in some circumstances, the phrase may be construed to embrace those whose labor on the estate, perhaps mostly out-of-doors, is nevertheless designed essentially to contribute to the convenience and comfort of the domestic establishment.
True, Mr. Savin bequeathed to household servants "in my home." This phrase is not the same as "in my house" which appears in the New York cases of Lafring v. Whitney, supra, and Givens v.Whitney, supra. Vice-Chancellor Buchanan in Chase NationalBank v. Deichmiller, supra, held that the word "home" means the entire residence estate. The testator also wrote "including my chauffeur." That phrase increases rather than decreases the meaning of the words "household servants." Apparently, the chauffeur did nothing more than drive the car. The testator probably feared that in the absence of specific provision the chauffeur would not be considered a person who worked on the estate. The phrase "servants who were employed therein" might have compressed the *Page 572 
meaning were it not for the fact that testator in the same sentence said "employed there," indicating that he did not conceive that there was any difference in those two adverbs. The specific provision for Thomas Campbell, "now employed at myplace" is explained by the increased sum bequeathed to this servant. The testimony reveals that the testator had assumed a special interest in Thomas Campbell, sending him to Rutgers University for training in agricultural courses.
Significantly, the periods of employment specified by the testator in the tenth article of his will appropriately related at the time to the existing employments of Mrs. Campbell and Mr. Bronson. The three petitioners were evidently capable and trustworthy servants who ministered to the comforts of the testator during the greater part of each year. Exhibiting, as he has, an extraordinary generosity toward the employees of his former business, one can scarcely surmise why the testator should desire to exclude the petitioners from the broad field of his bounty.
An analytical consideration of the will in the light of the surrounding factual circumstances, points to the conclusion that the testator intended to include the petitioners within the class of employees stated in article tenth of his will. In its adjudication of this issue, the decree of the Orphans Court is affirmed.
The present appeal also implicates the allowance of counsel fees in the Orphans Court. The following fees were granted: $1,500 to the two proctors representing all of the petitioners, $750 to a member of the New York bar and $1,500 to his resident associate, proctors for the executors, $100 to the proctor for certain legatees.
The relevant and influential facts governing the admeasurement of counsel fees in the Orphans Court are indicated with particularity in Estate of James E. Turnbull, Deceased, 1 N.J.Mis. R. 41, and cases therein cited.
In the proceedings here reviewed, the aggregate amount involved was $6,000. The allowances to counsel amount to $3,850. These fees seem to be manifestly excessive. The allowance of a counsel fee to the member of New York bar (there being no evident need of the services of an attorney *Page 573 
of a foreign jurisdiction) was improper. P.L. 1939 p. 471;N.J.S.A. 2:20-9; Barsotti v. Bertolino, 128 N.J. Eq. 363, 366;16 Atl. Rep. 2d 454.
Although the decedent's estate was relatively large, it is stated that some abatement of the general legacies will be necessary. The decree in its relation to the allowances of counsel fees to the New York attorney and to the proctor for the legatees is reversed and in respect of the other allowances it is modified to allow a counsel fee of $650 to the proctors of the petitioners and a fee of $500 to the proctor for the executors.
A decree will be advised affirming the decree of the Hunterdon County Orphans Court with the exceptions and modifications herein noted and the cause will be remanded to that court for proceedings in conformity with this opinion. *Page 574