Víctor López Figueroa, Plaintiff, Appellant, and Appellee,
v. Alfonso Valdés, Defendant, Appellee, and Appellant.

Nos. R-64-76, R-64-88.     Decided March 31, 1967.

*Luis M. Román Pérez* for appellant and appellee. *Pieras & Martín* for appellee and appellant.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Santana Becerra, and Mr. Justice Dávila.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Víctor López Figueroa, a laborer, filed a complaint in the Superior Court, San Juan Part, against his employer Alfonso Valdés in which he stated in synthesis that: He worked as caretaker or watchman of a mansion belonging to Valdés located on Taft St., Santurce, from 1954 to 1961, "day and night, including Sundays and holidays, seven days a week, thirty days a month during the 365 days of the year, *except for the hours he slept*, washed and ate," receiving a monthly pay of $60; that the house in his care was never occupied by a family, "there being inside very valuable furniture and household goods"; that he agreed with his employer to enjoy a 15-day vacation annually; he worked 31,000 extra hours without receiving compensation for them and was not granted vacation, for all of which his employer owed him $20,080.

He requested that judgment be entered in his favor for that amount and an equal sum as penalty imposed by law plus costs and attorney's fees.

Employer Valdés answered the complaint denying all its allegations and adducing several special defenses, among them that López Figueroa was not an employee "as that term is defined by Act No. 379 of May 5, [*sic*] 1948"; that on account of the nature of plaintiff's employment he was not entitled to extra hours, vacation and the seventh day according to the laws in force and that, if he were such employee, he had paid and compensated for all the work per-

formed by him, including extra hours. He set up other defenses which were neither argued nor decided by the court of instance.

The case went to trial. Both parties introduced oral evidence. Ramón Pagán Boria, William Romero Martínez and claimant himself testified for plaintiff. Defendant offered his own testimony only.

The case was adjudged on February 27, 1964. The findings of the trial court are the following:

*"Findings of Fact*

"1. Alfonso Valdés was the owner of a mansion located at 1 Taft Street in Santurce, Puerto Rico. This residence had belonged to Valdés' parents and his mother lived there until her death. The building stands on a lot of approximately three cuerdas the boundary of which is the Atlantic Ocean on the north side. Besides the main building there are other structures in the lot which traditionally have been used as lodgings for domestic help.

"2. The land of this mansion was always devoted to gardens, one part planted with a lawn and the rest with ornamental plants and trees.

"3. Valdés met complainant several years before this action was filed, when the latter worked as gardener for the mother of defendant herein.

"4. Once defendant's mother died he bought the mansion at a public auction by a deed executed by the court's marshal, in 1953. When he acquired the property its gardens were perfectly kept.

"5. In March 1954, remembering that complainant Víctor López had once worked as gardener at the house he sent for him and offered him work as such. It was agreed that he was to receive $60 a month and he was also offered accommodations in the service quarters of the mansion. Besides his work as gardener Valdés expected him to take care of the property inasmuch as it was unoccupied most of the time. It was so understood by complainant for which reason we conclude that as a matter of fact Víctor López rendered services as gardener,

caretaker and guardian of Valdés' property at 1 Taft St., Santurce.

"6. At the time complainant began to work for defendant the latter lived in the city of Mayagüez with his family. The house on Taft Street was completely furnished and was used by Valdés when he visited the city of San Juan. On those occasions, which occurred three or four times a month, he used to sleep in the house and stroll through the gardens, both for recreation and for the sentimental value it represented to him. On occasions he also stayed at the house accompanied by his wife. He had an employee who although she did not live on the premises of the mansion was in charge of the cleaning and care of the equipment inside the house and made the bed used by Valdés when he slept in the house.

"7. Alfonso Valdés used this residence in the aforementioned manner until December 1959 when he moved from Mayagüez to another mansion he had built at the place known as Caparra. The property on Taft St. was sold on July 14, 1959. [The correct year is 1960.]

"8. Complainant herein began to work around seven o'clock in the morning and continued to work until eleven o'clock at night when he went to bed. He took about an hour off at noon to have lunch and another hour in the afternoon to have dinner."

Since additional facts are determined in the conclusions of law we copy them below:

*"Conclusions of Law*

"1. Title 29 of L.P.R.A., § 285 is applicable to the facts in this case. In its relevant part said legal section reads thus:

'The provisions of sections 271–288 of this title shall not be applied to persons employed in domestic service; *Provided, however,* That they shall be entitled to one day of rest for every six days of work.'

"2. Employees whose activities and efforts are directed to the care, maintenance and service of the house for the pleasure, comfort and satisfaction of the needs of owners, according to the standard of living established by them are domestic servants. Long ago it was required that the domestic servant lived in the house where he served. In more recent times this limitation was abandoned, thus it being sufficient that he lived within

the premises of the house. We believe, considering the economic and social realities of modern life, that the place where the employee lives is irrelevant. His classification is determined by the nature of his work together with its permanent character. A gardener who also acts as caretaker has been considered a domestic service employee. *Anderson* v. *Ueland,* 267 N.H. 517; *Jack* v. *Belin's Estate,* 27 Atl.2d, 455; *Catto* v. *Plant,* 137 Atl. 764; *In Re Savin's Estate,* 26 A.2d 270.

"A citizen, depending on his needs and/or tastes may have more than one house. If he uses those houses as dwellings, even though sporadically, the employees in each and every one of those houses who meet the aforementioned requirements are domestic service employees. *In Re Savin's Estate, supra.*

"As we have stated in our findings of fact, Valdés, although residing in Mayagüez kept the house on Taft Street furnished, had a female employee who cleaned it and kept it inside and there he went to sleep when he came to San Juan. In such conditions his gardener-caretaker was a domestic service employee. This state of events lasted until December 1959. At that time Valdés moved to the metropolitan area. Now he does not allege or seek to use as dwelling the home on Taft Street, it was neither logical nor reasonable for him to do so. The house on Taft Street is no longer the place where respondent lived even if for very short periods and it is but one more property which belongs to him but is not in keeping with the comfort and services the owner expects to find in the place where he lives. Therefore, as of January 1960 petitioner ceased to be a domestic service employee and is covered by the provisions of 29 L.P.R.A. §§ 271 to 288.

"3. While petitioner was a domestic service employee he was entitled to a day of rest for every six days of work. Not having enjoyed said day of rest his employer is bound to indemnify him at a rate of double pay. In order to determine the single rate his monthly salary must be divided by thirty, the number of days in a month. From March 1954 to December 1959, both months inclusive, petitioner worked during three hundred and four (304) days of rest which compensated on the basis of twice his daily wages, that is, four dollars ($4.00) show that respondent owes petitioner $1,216.00 for that concept.

"4. From January 1 to July 13, 1960 petitioner worked fourteen hours a day during 168 days, thus being entitled to receive

double compensation for the six extra hours he worked daily. Said compensation is determined by dividing his monthly salary by 208 regular hours of work in the month. That operation shows that his wages were $0.288 per hour. Having worked 1,008 extra hours respondent owes him $597. During that same period he worked fourteen hours daily during twenty-eight days of rest, which fourteen hours should be compensated at double rate for a total of $228.67."

The following March 19 the trial court entered amended judgment ordering defendant "to pay plaintiff $2,041.67, amount he owes plaintiff for extra hours worked, plus an equal amount as penalty for a grand total of $4,089.34, plus $800 for attorney's fees."

The worker filed a petition for review of this judgment and fifteen days afterwards defendant filed his. In the light of the respective assignments in both petitions we decided to review the final judgment.

## I

First we shall dispose of the worker's appeal. He assigns five errors which can be summarized thus: (a) in determining that up to July 1959 petitioner was domestic employee of Alfonso Valdés for the purposes of Act No. 379 of 1948; (b) in fixing the amount of the compensation and; (c) in not allowing compensation for *"the hours when petitioner slept* inasmuch as his freedom of action had been limited and he had to sleep in and remain within respondent's property, therefore that constituted time worked also."

## (a)

The first question having been examined in the light of the concurring facts and circumstances, in our opinion, Víctor López Figueroa was not a person employed in the domestic service of Alfonso Valdés. He was a laborer who, for pay, was in charge of the caretaking, vigilance, custody, and

upkeep of one of the several properties of his employer, composed of a large lot with a furnished residence, but where no person or family lived.

Act No. 379 of May 15, 1948 which establishes the working day and the payment of double time for hours worked in excess of the legal working day, excludes from its provisions, in § 16, "persons employed in domestic service"; its § 19, devoted to definitions of words and phrases, such as "employee, employer, wage, occupation and labor contract" does not define "domestic service."

■ The *Diccionario de la Lengua Española* defines the term *"doméstico"* thus:

*"Doméstico (L. Domesticus, de domus, casa). Adj. Perteneciente a la casa u hogar . . . . Dícese del criado que sirve en una casa."** 

The contact between the employer or master and the employee or servant, which is predominantly familiar, is transformed into a labor or work relationship.

From the text of § 1474 of our Civil Code it is inferred that by domestic servant it shall be understood "a person employed for domestic service whether for the personal service of the head of the family or for the general service of the household."

■ Commenting on the matter Castán says in his work 4 *Derecho Civil Español, Común y Foral* 475, 8th ed. (1956):

"Domestic services: This contract is characterized by the personal and familiar nature of the services which are its object and by the ordinary living together which is presumed between its two members, called master and servant."

The Spanish Law of 1944 which regulates the labor contract, in its § 2(c) says that by domestic service it is under-

---

* Our translation:
"Domestic (L. Domesticus, domus, house). Adj. Relating to the household or the family . . . . A household servant."

stood "that which is rendered for day wages, salary, wages or other kind of compensation or without it, and that it be hired, not by an employer but by the head of a house or private dwelling, to the exclusive service of the hiring party, his family or dependents, whether he lodges in the employer's home or not."

The Louisiana Civil Code defines in its § 3205 the servant or domestic as: "Servants or domestics are those who receive wages, and stay in the house of the person paying and employing them for his service or that of his family; such are valets, footmen, cooks, butlers, and others who reside in the house."

■ To determine whether a person is employed in the domestic service it is important to examine the nature of the work performed by the worker if it is rendered in the master's home or outside but in connection therewith, and if his main work is necessary or desirable to contribute to the necessities and welfare of the family, or to the management or enjoyment of the house or dwelling.[1]

When the family's dwelling has some land devoted to the cultivation of plants delectable because of its flowers, colors or fragrance, with shade trees or bushes and the owner engages for its proper care, for pay, a person who by trade tends and cultivates gardens or has enough knowledge of that art, without gainful purpose, for the exclusive spiritual pleasure of the family, friends, and even visitors, there should not be any doubt that that gardener is a domestic employee of the household.[2]

---

[1] The continental case law, especially that related to workmen's accident compensation holds this criterion. See *Graham* v. *Commercial Credit Co.*, 200 A.2d 828, 830; *In re Savin's Estate*, 26 A.2d 270, 273; *In re De Forest's Estate*, 15 N.Y.S.2d 466, 469; *In re Johnson's Estate*, 282 N.Y.S. 806; *Wiseman* v. *Phipps*, 28 N.Y.S.2d 971, 973.

[2] In *Bustelo* v. *Industrial Commission*, 85 P.R.R. 559, 568 (1962), we said:

"On the other hand, Ortega was hired by a houseman, without

But there should not be any doubt either that the gardener employed to tend a garden whose ornamental flowers or plants are cultivated expressly to be sold to the public, or to take care of the garden of a hotel or of a commercial institution or industry, unrelated to a home or household,[3] is nobody's domestic servant.

█ In its finding of fact number 5, the trial court stated that in March 1954 Valdés sent for López Figueroa and offered him work as gardener for $60 a month, lodging in the premises. It also stated: "Besides his work as gardener, Valdés expected him *to take care of the property* inasmuch as it was *unoccupied most of the time*. It was so understood by complainant for which reason we conclude

___

gainful purpose, for a monthly salary, to perform the manual labor of conditioning his house garden twice a month. His labor meant to the family living therein the pleasure and satisfaction which a well-cultivated and tended garden produces. Under those circumstances, he was an employee engaged in Bustelo's domestic service whenever he was performing his work as a gardener, even though he lived outside, as were the other servants and employees, within the broader sense of the term 'domestic service.' See *Jack* v. *Belin's Estate*, 27 A.2d 455, 457 (Pa. Sup. 1942); *Anderson* v. *Ueland*, 267 N.W. 517, 518 (1936), 197 Minn. 518; 2 Schneider, Workmen's Compensation, § 627 (3d ed.), and 1 Supp. 1958, 498."

[3] In *Ocasio Calo* v. *Fajardo Sugar Co.*, 88 P.R.R. 554 (1963), we dealt with the compensation for services rendered by an employee of an industrial and agricultural concern who for many years worked as gardener. The question to be decided was whether he should be paid on the basis of the agricultural minimum wage or on the basis of the minimum wage corresponding to the industrial phase of the sugar business of the employer. We decided the wage for the industrial phase prevailed in spite of the fact that we were dealing with a gardener. In part of the opinion we stated:

"The enterprises are a unit of operation. In this respect, it is not difficult to understand why it is a traditional norm in the sugar industry to provide dwellings for its administrative officers, technicians and other high executives near the mill, as a necessity of the enterprise because of the nature of its functioning. And it is evident that the nettle, bramble, weeds and hawthorn, even the poet's, 'trellis of cundeamors' should not stand in the way of the free entrance to those residences, as well as that its surroundings be kept clean and trimmed as becomes the hierarchy of its dwellers. The petitioner in this sense was a maintenance employee like any other."

that, as a matter of fact, Víctor López rendered services as gardener, caretaker and guardian of Valdés' property at 1 Taft St., Santurce." (Italics ours.)

It should be noted that the trial court forms definitive judgment regarding that "the property . . . was unoccupied most of the time" and that complainant rendered services at "Valdés' property at 1 Taft St., Santurce." It never says, nor for that matter decides, that said mansion constituted the open house or dwelling, residence, abode, home, domicile, country home or family center of the employer. On the contrary, in No. 6 it concludes: "at the time complainant began to work for defendant the latter lived *in the city of Mayagüez with his family.*"

According to the testimony of defendant-employer, that property belonged in part to his mother. She died in 1948. In 1954 Valdés bought the property at a public auction. When asked what plans he had regarding the property he answered:

"My plans were to rebuild, lease, remodel it or build on a lot I had in Caparra . . . I was thinking where to build, whether in Caparra or rebuild that, modernize it." (Tr. Ev. 96.)

When asked "During the years you owned that house on Taft St. what use, if any, did you give it?, he answered, "Well, *I did not live in the house,* I lived in the Castillo in Mayagüez, in a house I had there . . . ." (Tr. Ev. 96–97.) (Italics ours.)

Defendant also testified that "my daughters were in the United States and my wife did not come to San Juan often"; that she came to San Juan "an average of two or three times a month. And when my wife came, I must admit and tell the truth, many times we stayed at the Hilton because it was much more comfortable for her, but many times we stayed at the house." (Tr. Ev. 98.)

Regarding complainant and the only person who took care of him when he stayed at the house, Valdés testified that complainant did not have a key to the house and:

*"I may add that he never had to go inside the house for anything* and there was a lady who had been my father's former secretary, Margarita Balzac, *who was the one who went in to make my bed and once in a while to clean the house inside,* that she died about a month ago." (Tr. Ev. 104.) (Italics ours.)

Upon deciding to transfer his home to San Juan Valdés forgot his plans to lease or build a modern residence on his property at Taft St. (he had stated that "the house at Taft St. was not very suitable to be lived in, that for many years he thought of modernizing it" and that it was not taken care of appropriately) and decided to build and establish it on the lot at Villa Caparra. (Tr. Ev. 131.)

When asked what plans did he have from then on for the property at Taft Street he answered:

"Then I thought of selling it and naturally I wanted to continue keeping the garden in good shape because a house as big as that, well, I repeat, was worth more, much, much more (with) a well-kept garden than without it." (Tr. Ev. 106.)

The propery was sold "to Fullana" on July 14, 1960. The furniture kept in the house, according to Valdés' estimate, was worth between three and four thousand dollars. The property had cost him $65,000 in 1954. He did not remember how much he had resold it to Fullana[4] for.

The occasional visits of Valdés to his property on Taft Street, made in connection with his businesses and interests

---

[4] In a motion for reconsideration before the Superior Court, which was successful in part, complainant sustained that his employer bought it in that amount as the latter stated but that he "speculated with it until he sold it in an amount over half a million dollars . . . ." Such affirmation is repeated in the petition for review.

in the metropolitan zone, the state of carelessness in which that building was kept, his willingness to lease or destroy it and build in the three-cuerda lot the mansion which suited a family of a high social and economic standard as his, his plans to sell it with a garden which would make it attractive for residential development in one of the most expensive urban zones in Puerto Rico, the fact that he had and kept his family home or dwelling in Mayagüez and then in Villa Caparra, that Valdés counted only on Margarita Balzac for fixing his bed and cleaning the house on the counted occasions in which he stayed there, the fact that complainant did not have a key to the house or even authority to go in, to the point that he never went inside, constitute strong reasons to discard the idea that Víctor López Figueroa was ever employed there as a domestic servant, either for the personal attention of the head of the family, or for the general service thereof, as provided by said § 1474.

Accepting that López Figueroa had never worked also as "caretaker in charge of Valdés' property," as the trial court stated, but exclusively as gardener, as sustained by the employer in his brief, his condition as such gardener would not place him ipso facto in the position of servant or groom of the person who hired him and paid for services to himself, his family or dependents. The art of gardening and the trade of gardener are not necessarily bound to be developed or practiced in the domestic premises.

He never worked in the gardens of "El Castillo," name given to the former residence of his employer in Mayagüez. He did not work either in Villa Caparra, new permanent, habitual and continuous residence of Valdés. Furthermore, during all those years Valdés kept a gardener for his home in Mayagüez and he so stated when he testified regarding the vacation he had granted to complainant:

". . . I remember about the vacation because I had to convince the employee at El Castillo, the gardener, to come to San Juan and take over the garden here." (Tr. Ev. 138.)[5]

The fact of having received temporary lodging in the dependencies of the old building built for the use of the servants, where complainant was not given meals or other home facilities such as clothing and medical care in case of illness, is not in itself a constitutive factor of the status of domestic employee. That was an accessory condition to the labor contract, because of it, proposed by the employee and accepted by the employer. As the judge stated ". . . besides he asked for a place to live there and . . . Valdés accepted that very willingly . . . he thought it was beneficial." (Tr. Ev. 121.) That circumstance did not have any relation regarding the personal attentions of his employer or the latter's family needs.[6]

With what we have stated so far, based on the conclusions of the respondent court, on the testimony of the defendant employer and on the assumption that López Figueroa had only worked as gardener, we cannot consider personified, with all the essential characteristics which integrate it, the figure of the domestic employee referred to in Act No. 379 of 1948. That is a legislation whose main objective is the effective protection of the health, safety and life of the laborer by eliminating the exploitation of the worker by

---

[5] That gardener of the Valdés' family was not brought to testify. There was no deposition at all from Margarita Balzac. Antonio, Valdés' driver who went to get complainant for work in 1954 was not brought to testify either.

[6] Valdés testified:

"A. I never talked to him about the house or the furniture, furthermore, he never saw the inside of the house. I heard him say now that he went inside with my wife, I did not know about that. I never asked him to do so, had he dared I would have shown him the furniture and he didn't even had a key to the house." (Tr. Ev. 119.)

means of excessive working days,[7] with a cutting saving provision which expressly deprives of that protection human beings whom the adversities of life have prevented from rising above the level of domestic employees.

That inequality in terms of protection and benefits, between the employee fully protected by Act No. 379 and the domestic employee, servant or groom, left to his doom, subject to the infinite variety of human nature, is supposed to be equitable set off by those intangible facilities or benefits which come to them, and some times to their dependents, together with their wages, from living in a good family home, such as comfortable and safe shelter, good meals, adequate clothing, medical care and medicines, employment for life, Christian treatment, intellectual enhancement, recreation, use of property and family relations.

The trial court classifies the complainant gardener-caretaker as domestic servant or groom of Valdés from March 30, 1954 to December 31, 1959 without any right to compensation for the fifty extra hours of work he performed weekly, granting compensation only for the days of rest on which he also worked. Nevertheless, from January 1 to July 14, 1960, the court attributes to the same gardener-caretaker the status of employee of his employer Valdés, completely covered by Act No. 379, with indisputable right to compensation, at double rate of those fifty extra weekly hours.

That, apparently, is due to the fact that, according to the trial court, in December 1959, "Valdés moved to the metropolitan area . . . now he does not allege or seek to use as dwelling the home on Taft Street . . . . The house on Taft Street is no longer the place where respondent lived even if for very short periods and it is but one more property which belongs to him but is not in keeping with the comfort and services the owner expects to find in the place where

---

[7] During the years from 1954 to 1960 López Figueroa worked 14 hours a day.

he lives."—See Conclusion of Law No. 2 of this opinion.

We repeat that that conclusion of the trial court, in its version restricted to those first six months of 1960, is in no way sustained by the evidence introduced by both parties. It is, on the contrary, regarding the time the laborer worked, denied or rebutted by the defendant-employer himself in the clear terms we stated in the fourth paragraph of the preceding page 236. Valdés, referring to all the years he owned the house, stated: ". . . *I did not live in the house, I lived in the Castillo in Mayagüez, in a house I had there . . . .*" (Italics ours.)

Between those apparent and arbitrary two periods, there is no change in the nature, location, condition and hours of work, purposes of the task, and the fundamental circumstance that there was not in the property any constituted family of the employer. It is the gardener-caretaker himself, as the trial court stated, who gets up at six in the morning to take care of the old building and its surroundings, and goes to bed at eleven o'clock at night after a working day consisting of 14 consecutive hours. "He generally behaved well", testified Valdés. (Tr. Ev. 137.)

On the other hand, complainant submitted oral testimony —statements of Ramón Pagán Boria, William Romero Martínez and his own—which strongly tried to sustain his thesis that he was not hired as gardener but as caretaker, even though every once in a while he cleaned the lot for the purposes of eliminating the undergrowth therein so as to perform better his vigilance work inasmuch as the gardens "were abandoned, it was a wilderness." (Tr. Ev. 27.) The three witnesses affirmed that the house on Taft Street "was uninhabited, nobody had ever lived in it", Valdés did not use it at all, "he came every once in a while just to see it."

In its § 19 Act No. 379 not only contemplates the work specifically agreed but also that tolerated or allowed to be performed. The term "occupation" includes every service,

work, labor, help, or toil that an employee performs for his employer.

(b)

Contrary to the provisions of § 4(e) of Act No. 379 the respondent court only granted payment for the first eight of the fourteen hours of work of each supposed day of rest. Therefore, the second error assigned by complainant was committed.

From March 30, 1954 to July 14, 1960—6 years, 3 months and 14 days—López Figueroa worked 2,297 days. These are broken down into 1,969 regular days on which he worked 6 extra hours, with a total of 11,814 extra hours and 328 seventh days or days of rest, on which he also worked 14 extra hours daily with another total of 4,592 extra hours. The sum of all those extra hours amounts to 16,406. Paid at 0.576 an hour—which is the double rate—the amount of $9,449.86 should be compensated for those 16,406 hours. With the equal sum to be paid by the employer, as legal penalty for having given rise to the judicial claim, the principal to be paid is $18,499.70.

(c)

It is not proper, under the circumstances of the case, to grant compensation for the hours during which plaintiff slept. In part of his complaint López Figueroa stated:

"3. That he worked day and night, including Sundays and holidays, seven days a week, thirty days a month during the 365 days of the year, *except for the hours he slept, washed and ate.*" (Italics ours.)

It is in his motion for reconsideration before the respondent court where he first seeks to be paid for the hours he took for bathing, eating and sleeping, on the ground that every moment he was "bound to remain" in the property. In part of that motion he states:

"Therefore the court must have concluded that this laborer was even entitled to the hours he slept, even though *those hours were not alleged by complainant because he considered it unjust to collect for the hours during which he slept* although it would have been right to compensate him for them." (Italics ours.)

■ Complainant stated that he had never received orders from his employer of not leaving the property either in the daytime or nighttime; (Tr. Ev. 11) he left it freely to have his meals.

Certain periods of inactivity within the working day have been recognized, the characteristic or nature of work periods being compensated as such on account of the fact that during them the employee is not free to devote himself to those tasks he wants and he should be alert, ready and subject to be called for work.

■ But in this sense no steadfast rule can be established for determining when the waiting is compensable and we must consider, as a whole, the circumstances of each case as we decided in *Heirs of Meléndez* v. *Central San Vicente*, 86 P.R.R. 377, 382 (1962).

In *Armour and Co.* v. *Wantock*, 323 U.S. 126, and *Skidmore* v. *Swift*, 323 U.S. 134, decided December 4, 1944 it was held that the hours usually devoted to sleeping are not compensable, although those comprised in the waiting time are.

In *Rokey* v. *Day and Zimmermann, Inc.*, 157 F.2d 734, *cert. den.*, 330 U.S. 842 the court stated at p. 737:

"When ample consecutive hours of sleep are permitted on the premises of the employer, even though the employee is subject to calls to duty, for which he is paid, and these are occasional but infrequent, he is not during the time spent in sleep, at work. He is getting sleep in the same manner as if he were normally getting sleep at his home or in a hotel."

244

· In *Bowers* v. *Remington Rand, Inc.*, 159 F.2d 114, *cert. den.*, 330 U.S. 843, the court pointed out that the employees had entered into a contract of employment under which they agreed to sleep at the plant subject to call, and that the sleeping period did not constitute working time.

Other case law which contains similar decisions are: *Bell* v. *Porter*, 159 F.2d 117, *cert. den.*, 330 U.S. 813; *Buckner* v. *Armour and Co.*, 53 F.Supp. 1022; *Bridgeman* v. *Ford, Bacon and Davis, Inc.*, 64 F.Supp. 1006; *McGregor* v. *Trojan Powder Co.*, 11 CCH Lab. Cas. 63:465; *Plummer* v. *Harvester War Depot, Inc.*, 70 F.Supp. 495; *McLaughlin* v. *Todd and Brown, Inc.*, 15 CCH Lab. Cas. 64:606; *Ciemnoczolowski* v. *Q. O. Ordnance Corp.*, 119 F.Supp. 793 and others.

The scarce number of decisions where it has been held that the hours devoted to sleep are compensable as working time have made the distinction, either as to the type of labor contract executed or as to whether the person was expressly and absolutely refused permission to leave the premises.

On the other hand it has been decided regarding night watchmen or caretakers of whom it is required to stay within the employer's premises for an additional period and during which they are allowed to sleep, that the sleeping period does not constitute working time. *Van Dyke* v. *Bluefield Gas Co.*, 210 F.2d 620, *cert. den.*, 347 U.S. 1014; *Neal* v. *Braughton*, 111 F.Supp. 775; *Perry* v. *George P. Livermore, Inc.*, 165 S.W.2d 782; *Johnson* v. *Dierks Lumber and Coal Co.*, 130 F.2d 115, Stone, Circuit Judge, concurring; *Muldowney* v. *Seaberg Elevator Company*, 39 F.Supp. 275.

The very few cases where it has been decided that the hours devoted to sleep by watchmen and caretakers are compensable as working time do not even have a remote application to the case at bar because they are very special situations. For example, a guard who had to remain within the premises of a plant during *a strike* or a night watchman

who was *napping* while working. (See *Campbell* v. *Jones and L. Steel Corp.*, 70 F.Supp. 996; *Martin* v. *Graham Ship-By-Truck Co.*, 176 S.W.2d 842; *Aufiero* v. *E. A. Laboratories*, 271 App. Div. 1024, 69 N.Y.S.2d 217, among others.)

Employees who are not tied down to any particular place, being merely required to leave word where they can be reached, are not working within the meaning of the Federal Wage and Hour Act. (See *Dumas* v. *King*, 157 F.2d 463 in a dictum at p. 466 and *Super-Cold Southwest Co.* v. *McBride*, 124 F.2d 90, and in our jurisdiction, *Deyá* v. *Otis Elevator Co.*, 91 P.R.R. 649 (1965).)

## II

We will now dispose of the employer's appeal. He sustains that the respondent court erred in concluding (1) that he expected López Figueroa to look after the property; (2) that he rendered services as caretaker; (3) that plaintiff worked from seven in the morning until eleven o'clock at night; (4) that he stopped being a domestic service employee starting January 1, 1960; (5) that said plaintiff was entitled to a day of rest for each six days of work; (6) that he had not enjoyed his day of rest, and (7) that plaintiff worked extra hours starting January 1, 1960.

The appellant-employer has submitted his appeal on the merits of the memorandum he introduced to support his petition for review, in which he discusses "all the errors jointly inasmuch as they are directed to only one issue . . . that besides being gardener, plaintiff . . . was bound to act as caretaker and . . . worked 14 hours daily and the seventh days."

None of those errors was committed. They refer mostly to the weighing of the evidence. The employer considers that this, in its fundamental part, was susceptible of only one interpretation: that López Figueroa always acted as

Valdés' domestic service employee. We have already stated the reasons for not sharing that view. The evidence does not show any occasion where said gardener busied himself with "the personal service of the head of the family or for the general service of the household," as prescribed by § 1474 of our Civil Code, and much less that from March 1954 to July 14, 1960 somebody kept a constituted family in the old and dilapidated large house on Taft Street.

Nevertheless, we may be in agreement with assignment number four, but in the sense that López Figueroa was never a domestic service employee of Alfonso Valdés.

The problem here does not actually involve the determination of whether or not he was entitled to a day of rest. Because the laborer worked as he correctly alleged, ". . . day and night, including Sundays and holidays, seven days a week, 30 days a month during the 365 days of the year . . . ." The evidence of both parties, if weighed as a whole, does not fail to prove so. That introduced regarding the nature of the work performed and the hours he spent in performing it, is not incredible if we take into consideration that the laborer was the person therein in charge of vigilance, caretaking and exterior upkeep of a very valuable property located in a zone frequently visited both day and night by all kinds of people. It is not impossible then, on the other hand, that a person may render those services from 7 in the morning until 11 o'clock at night.

We are dealing then with a laborer who works 98 hours each week. Out of that total of 98 hours, 50 are extra hours of work by provision of § 4(b) of Act No. 379. Every employer who employs "or permits an employee to work" during extra hours shall be obliged to pay him for each extra hour a wage rate equal to double the rate agreed upon for regular hours, pursuant to § 5 of the same Act.

For the reasons stated the judgment appealed from will be modified in the sense of granting the appellant-appellee

laborer a compensation amounting to $9,449.86, for the 16,406 extra hours of work, plus an equal amount for the liquidation of damages, besides costs, expenses and attorney's fees already fixed, as prescribed by § 13 of Act No. 379, and as thus modified it will be affirmed.