**CIEMNOCZOLOWSKI et al.**
v.
**Q. O. ORDNANCE CORP.**

**DUNNING et al.**
v.
**Q. O. ORDNANCE CORP.**
Civ. A. Nos. 111, 133.

United States District Court, D. Nebraska, Grand Island Division. March 24, 1954.

1. See United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039.

Thomas W. Lanigan, Grand Island, Neb., and Charles W. Hess, Jr., of the law firm of Terrell & Taylor, Kansas City, Mo., for plaintiffs.

George L. DeLacy and Leo Eisenstatt, of the firm of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for defendant.

DONOHOE, Chief Judge.

■ ■ These actions were instituted by plaintiffs against the Q. O. Ordnance Corporation of Grand Island to recover statutory compensation under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. Since there were many common questions of law and fact, the cases were consolidated for trial. Rule 42(a), Fed.Rules of Civ. Proc., 28 U.S.C.A. Case No. 111 was instituted by Frank A. Ciemnoczolowski on behalf of himself and all guards, guard matrons and firemen similarly situated. Case No. 133 was instituted by Joseph Dunning on behalf of himself and all line production workers, line inspectors, safety inspectors and area maintenance workers similarly situated. The defendant moved to dismiss these actions with respect to all plaintiffs not named in the caption of the complaints because as to them the actions were not "commenced" within the time limitations placed upon such actions by the Portal-to-Portal Act.[1] An action is "commenced" with respect to any plaintiff if within the time allowed (1) the person is specifically named as a party plaintiff, or (2) his written consent to become a party plaintiff is filed in the case. The court is of the opinion that all plaintiffs were specifically named within the time allowed because their names appear on a schedule which was attached to, and by reference made a part of, the original and amended complaints. *Gibbons v. Equitable Life Assurance Society of United States,* 2 Cir., 1948, 173 F.2d 337; *Culkin v. Glenn L. Martin Nebraska Co.,* D. C.Neb. 1951, 97 F.Supp. 661, affirmed, 8 Cir., 197 F.2d 981.

The case was tried to the court and after careful consideration of the legally admissible evidence adduced at the trial, the court, in keeping with Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A., makes the following special

### Findings of Fact.

In the spring of 1942, the United States erected the Cornhusker bomb and shell loading plant on the outskirts of Grand Island, Nebraska. The plant area, comprising some twenty square miles, and the buildings thereon, were at all times material to this action owned by the United States. On February 27, 1942, the United States entered into an agreement with the defendant, the Q. O. Ordnance Corporation, a Delaware Corporation, relating to the operation of the Cornhusker plant. Pursuant to

---

1. 29 U.S.C.A. § 255. Statute of Limitations.

"Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

\* \* \* \* \*

"(b) if the cause of action accrued prior to May 14, 1947—may be commenced within whichever of the following periods is the shorter: (1) two years after the cause of action accrued, or (2) the period prescribed by the applicable State statute of limitations; and, except as provided in paragraph (c), every such action shall be forever barred unless commenced within the shorter of such two periods;

"(c) if the cause of action accrued prior to May 14, 1947, the action shall not be barred by paragraph (b) if it is commenced within one hundred and twenty days after May 14, 1947 unless at the time commenced it is barred by an applicable State statute of limitations."

this [2] and two additional agreements [3] the Ordnance Corporation undertook operation of the plant and bombs and shells were loaded on a twenty-four hour basis for use by the United States in the conduct of World War II. The finished products were shipped in interstate commerce to points outside the state of Nebraska. Actual production, i. e. pouring explosives into shells, did not commence until November 11, 1942. However, materials used in production, were shipped into Nebraska, via interstate commerce, and were received and stored at the Cornhusker plant prior to that date.

The defendant, in carrying out the contracts employed the plaintiffs herein as guards (including matrons), firemen, line operators, production inspectors, safety inspectors and area maintenance men.

### 1. Guards.

From the time the first guards were hired on March 21, 1942, until May 10, 1942, the guards were paid on an eight hours per day basis. Three or four guards began their duties on March 21, 1942, guarding a warehouse in the Safeway Building in Grand Island, Nebraska. Guards were later placed on duty at defendant's office in Grand Island. In April, when construction of the Cornhusker Ordnance Plant commenced approximately five miles from Grand Island, guards were assigned duty there. During the week beginning April 9, 1942, classes for some of the guards were commenced in Grand Island. The guards attending them were paid eight hours' time per day unless their time cards showed otherwise. Until May 3, 1942, each guard reported directly to his post at the start of his shift. From May 3, 1942, until May 10, 1942, the guards, except those attending classes, were required to report to the Safeway Building in Grand Island for roll call and assignment to posts at the start of each shift. They then went to their posts in time for the shift start. The shifts were

eight hours and began at 7:00 a. m., 3:00 p. m., and 11:00 p. m. During the period from March 21, 1942, until May 10, 1942, the guards had no uniforms, carried no arms and did not punch a time clock. Each guard kept his own time on forms provided by the defendant; and the guards turned these forms in each Saturday. No guard turned in time for, nor was any guard paid for, reporting for roll call and assignment prior to going to his post at the start of the shift during the week of May 3 to May 10, 1942.

On or about May 10, 1942, time allowance was increased from 8 to 8½ hours per shift, and the shifts were changed to the following:

Shift No. 1—10:30 p. m. to 7:00 a. m.
Shift No. 2— 6:30 a. m. to 3:00 p. m.
Shift No. 3— 2:30 p. m. to 11:00 p. m.

From May 10, 1942, until October 31, 1942, the guards were paid on the basis of 8½ hours per shift. From May 10, 1942, to May 31, 1942, the guards reported to the Safeway Building in Grand Island at the beginning of the shift for roll call and assignment and then proceeded to their posts. On May 31, 1942, a temporary guard headquarters, which contained a time clock, was established in an abandoned farm house on the edge of the plant area. Thereupon all guards working in the plant area were required to clock in at temporary guard headquarters at the start of the shift, instead of reporting to the Safeway Building in Grand Island. Upon being relieved, those on posts in the plant area were required to return to guard headquarters to clock out. On September 26, 1942, permanent headquarters were established in the permanent guard building on the plant area grounds and the temporary headquarters were abandoned.

From October 31, 1942, until the end of operation of the Cornhusker Ordnance Plant by the defendant, the guards were paid on a basis of 8¾ hours per shift.

2. Government Contract No. W-ORD-601.

3. Government Contracts Nos. W-05-016-

Eng-240 (July 25, 1944) and W-05-016-251 (Oct. 5, 1944).

The additional time allowance was made effective by changing the regular shift schedule to the following October 31, 1942:

Shift No. 1—11:30 p. m. to 8:15 a. m.
Shift No. 2— 7:30 a. m. to 4:15 p. m.
Shift No. 3— 3:30 p. m. to 12:15 a. m.

These shifts were continued until November 28, 1942, when they were changed to the following:

Shift No. 1—10:15 p. m. to 7:00 a. m.
Shift No. 2— 6:15 a. m. to 3:00 p. m.
Shift No. 3— 2:15 p. m. to 11:00 p. m.

Pursuant to this change, the guard mount was to be held at 10:15 p. m., 6:15 a. m., and 2:15 p. m., and the clock was to be punched not later than five minutes after the designated time of guard mount. After September 29, 1943, guard mount was held at 10:20 p. m., 6:20 a. m., and 2:20 p. m., and the clock could be punched not later than those designated hours.

On or about November 8, 1943, an order was issued to the guards that beginning November 8, 1943, all guards would be required to leave their uniforms at the plant. Lockers were provided for the guards in which the uniforms would be left when the guards were not on duty and where usual wearing apparel would be kept when the guards were on duty. This altered the previous practice of allowing the guards to wear their uniforms home or leave them at the plant as they saw fit.

It was usual for the guards to enter the main gate, go to their lockers and change clothes and clock in prior to the start of their shift. After clocking in the guards would proceed to guard mount which included roll call, inspection, instructions and orders for the day. From guard mount the guards would proceed by their own or company transportation to their posts. All the activities engaged in by the employees, prior to the time they reached their posts were preliminary activities and were not part of the day's principal activities.

When the guards reached their posts, they were required to remain at their posts until relieved. The guards were allowed to eat their lunches at their posts but were not relieved of their duties for that purpose and the company did not take any deduction from their pay for time spent eating their lunches. The activities engaged in by the guards while they were eating their lunches were part of their principal activity and they received full compensation therefor.

At the end of the shift period the guards returned to the guard headquarters to clock out. Usually the guards were returned in ample time to check out by the end of the shift. If a delay of more than seven minutes in returning a guard to headquarters at the end of the shift occurred, the guard would make a claim to the shift captain, which claim was initialed by the chief of the guards, and additional compensation was paid. All claims made under these circumstances were allowed and paid. The guards changed their clothes, turned in their guns and clocked out at headquarters. Returning to headquarters, turning in guns, changing clothes and checking out were postliminary activities and were not part of the guard's principal activity.

Prior to May 10, 1942, the shift periods did not overlap. The guards reported to their posts at the beginning of their shifts and left them at the end of their shifts and did not receive any compensation for preliminary and postliminary activities. From May 10, 1942, until October 31, 1942, the shift periods overlapped each other by thirty minutes. As a practical matter, this meant that there were thirty minutes during which the guards could engage in preliminary and postliminary activities and receive compensation therefor. From October 31, 1942, until operations ceased the overlap was increased to forty-five minutes so that, as a practical matter, the guards had three-fourths of an hour during which they could engage in pre-

liminary and postliminary activities and receive compensation therefor.

█ The evidence fails to convince the court of a single instance in which a guard engaged in the principal activity and did not receive compensation therefor. The evidence fails to convince the court that there was any contract, custom or practice, during the period in question, to pay the guards compensation for preliminary activities engaged in prior to, and postliminary activities engaged in after, the shift period.

The organization of guards consisted of a chief of guards, shift captains, sergeants, guards and matrons. One captain was in charge of each shift, i. e. in charge of the entire plant area during the shift period. Under the captain, there were sergeants in charge of various subdivisions of the area called "districts". One sergeant would be in charge of one district for each shift. The sergeants were supervisory personnel. They were paid by the month, and not by the hour, and in all cases received at least $200 a month.

### 2. Firemen

The defendant established a fire department for use in conjunction with the operation of the ordnance plant. The organization of this department included the fire chief, assistant fire chief, captains in charge of the shifts, and the firemen. From the start of operations until the 29th of August, 1943, the firemen worked in the following three shifts:

> 7:00 a. m. to 3:00 p. m.
> 3:00 p. m. to 11:00 p. m.
> 11:00 p. m. to 7:00 a. m.

with the exception of a few weeks during which the shifts were:

> 8:00 a. m. to 4:00 p. m.
> 4:00 p. m. to 12:00 Midnight
> 12:00 Midnight to 8:00 a. m.

The firemen engaged in certain preliminary activities such as traveling from the gate to their headquarters, clocking in and changing their clothes.

In some instances these preliminary activities were engaged in prior to the beginning of the shift period and the firemen did not receive compensation therefor. However, the evidence fails to convince the court that there was any contract, custom or practice to pay the firemen for their preliminary activities which occurred prior to the start of the shift.

█ During the eight-hour shift period the firemen engaged in their principal activity and they were not completely relieved of their duties for lunch. However, the company did not make any deduction for the time actually spent by the firemen while eating their lunch. The evidence does not convince the court that there were any instances in which a fireman engaged in the principal activity of the day and did not receive full and adequate compensation therefor.

█ While the firemen were working three shifts, they engaged in certain postliminary activities, such as clocking out, changing clothes and traveling from headquarters to the main gate. They did not receive any compensation for these activities if they occurred after the shift period. However, the evidence fails to convince the court that there was any contract, custom or practice to pay the firemen for their postliminary activities which occurred after the end of the shift period.

On August 29, 1943, the defendant company established the two-platoon system for the firemen at the plant. Under this system the firemen were required to be on duty for twenty-four hours and then they would be off duty for twenty-four hours. The firemen were paid for only sixteen hours of the twenty-four that they were on duty. Each fireman was allowed an eight-hour sleeping period.

In some instances a fireman might be required to stand watch on the floor or at the PBX switchboard, for periods varying from two to three hours duration during the eight-hour period de-

nominated sleeping time. When these watch periods occurred during sleeping time the firemen were allowed a rest period, prior to midnight, which was equal in hours to the sleeping time actually spent on watch.

On rare occasions the firemen were called to duty from their sleep because of an emergency arising during the sleeping period. In these instances they were paid one and one-half times the regular hourly rate for the time actually worked. During the entire operations of the defendant company when the two-platoon system was in force, there was a total of sleeping time hours of 6360, only 11.9 hours of which were spent in taking care of emergency calls.

The company furnished the firemen a recreation room, a dining room, a kitchen fully equipped, and a sleeping dormitory equipped with beds, sheets and blankets. The first eight hours of the twenty-four hour shift was considered work time, the next eight was considered recreation time during which the firemen were on call but were free to play games, listen to the radio and otherwise amuse themselves. The firemen were allowed to, and did, prepare and consume their meals on the company's time. They were allowed to, and did sometimes, retire prior to the end of the first sixteen hours, i. e. prior to midnight.

The evidence fails to convince the court of a single instance occurring while the firemen were on the two-platoon system in which a fireman engaged in the principal activity and did not receive compensation therefor. Although in some instances during this period the firemen may have engaged in preliminary or postliminary activities without compensation, the evidence fails to convince the court that there was in existence any contract, custom or practice to pay for these preliminary and postliminary activities.

The establishment of the two-platoon system by the defendant was in good faith, in conformity with, and in reliance upon the approval of the deputy administrator of the Wage and Hour Division of the United States Department of Labor.

The firemen and the guards received full compensation at the regular rates of pay for all periods of drill and pistol practice.

### 3. Line Operators

The line operators were engaged in loading bombs and shells. In all, there were four bomb and shell loading lines on the plant site. Each line was approximately one mile in length and consisted of many buildings connected by ramps. At the end of each line there was a building known as a change house. The lines were surrounded by fences and the employees gained access through the fence at the gate house where they were searched and relieved of all hazardous objects contained on their persons. In the earliest days of operation the time clock was located at the gate house and the employees clocked in there. From the gate house the line operators went to the change house. In the basement of each change house there was a cafeteria and the employees could leave their lunch pails, if they had any with them, in the cafeteria.

The change house was divided into two separate units; one for the men and one for the women. Each employee would enter his respective unit, take off his clothes and put them in a locker provided for that purpose. He would then proceed to another room in which he had a different locker containing his powder clothes. He would put on his powder clothes, consisting of underwear, overalls, stockings, safety shoes and some type of hair covering, and then proceed out of the change house to his respective position on the line where he performed his duties. In connection with the change house, it should be mentioned that the time clock was kept inside of the change house for a time but was later moved to the ramp just outside the gate house on the side nearest the lines.

During the shift period the line operators were allowed a forty-five minute lunch period. The employees were re-

quired to eat their lunches in the cafeteria in the change house and the company did not make any deduction for time spent by the employees for their lunch.

At the end of the shift, the line operators would return by way of the ramp to the change house, take off their powder clothes, shower when desirable,[4] put on their street clothes, proceed to the gate house, pick up their detained belongings, and then leave for their homes.

From the commencement of operations by the defendant until termination thereof the shifts ran as follows:

Shift No. 1— 8:00 a. m. to 4:00 p. m.
Shift No. 2— 4:00 p. m. to 12:00 a. m.
Shift No. 3—12:00 a. m. to 8:00 a. m.

The line operators were paid for eight hours, no deduction being made for lunch time. The time cards show that oftentimes the employees clocked in shortly before the beginning, or clocked out shortly after the end, of the shift period. However, the evidence fails to convince the court that the employees ever engaged in the day's principal activity without receiving compensation therefor and there was no contract, custom or practice to pay the employees for preliminary activities engaged in before, or postliminary activities engaged in after, the shift period.

#### 4. Line Inspectors

What has already been said about the line operators applies equally to the line inspectors. However, the line inspectors had the additional duty of turning in reports at the end of the shift. The evidence is conflicting with respect to how much time was spent in preparing the reports and the evidence fails to convince the court that any line inspector spent any time, which can be reasonably calculated, or which was not inconsequential, in preparing and submitting such reports after the shift period.

#### 5. Safety Inspectors

An organization was established at the defendant's plant to deal with safety procedures. At the head of this was the chief safety engineer and under him were safety inspectors who were directly responsible to the chief safety engineer. The safety inspectors wore a special uniform with a badge and one safety inspector would keep surveillance over one line each shift. Whenever he observed a condition which violated the established safety requirements he would take it up with the foreman of the department so that the situation could be remedied. If the matter was not cleared up, the safety inspector would report to the chief safety engineer who would consult with top management in the matter.

Each safety inspector was in full charge and was not supervised by the chief safety engineer, except in a very general way, and each safety inspector had to regularly and customarily exercise discretion and independent judgment. The safety inspectors were specially trained and did not perform nonspecialized work. All of the safety inspectors received pay in excess of $200 a month.

The evidence fails to convince the court that the safety inspectors ever engaged in the day's principal activity without receiving compensation therefor; and there was no contract, custom or practice to pay the employees for preliminary activities engaged in before, and postliminary activities engaged in after, the principal activity.

#### 6. Area Maintenance Men

The area maintenance men were on an eight and one-half hour shift. However, they were paid for only eight hours because they were given a one-half hour lunch period. The evidence

---

4. The explosive operators, who worked in buildings in the center portion of the line where the explosives were melted, poured and processed, were required to wear powder clothes and take a shower at the end of the shift. The other line operators were not.

discloses that they actually received half an hour to eat their lunch at all times. The employees were fully compensated for all principal activities in which they engaged; and there was no contract, custom or practice to pay them for preliminary and postliminary activities.

### Discussion

■ An employee who brings an action under the Fair Labor Standards Act for additional compensation has the burden of proving by a preponderance of the evidence that he has performed work for which he has not been properly compensated; and evidence which is too uncertain or conjectural to permit a finding that he worked some definite number of overtime hours or parts thereof, will not satisfy this burden. Mornford v. Andrews, 5 Cir., 1945, 151 F.2d 511. Under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., as modified by the Portal-to-Portal Pay Act, 29 U.S.C.A. § 251 et seq., in order for an employee to recover in this case the court would have to be convinced

■ a) that the employee engaged in principal activities and was not properly compensated therefor; or

b) that the employee engaged in preliminary or postliminary activities; that he was not properly compensated therefor; and that there was in existence a contract, custom or practice to pay the employees for preliminary and postliminary activities. Central Missouri Telephone Co. v. Conwell, 8 Cir., 1948, 170 F.2d 641; United States Cartridge Company v. Powell, 8 Cir., 1950, 185 F.2d 67, opinion modified 8 Cir., 186 F.2d 611; Glenn L. Martin Nebraska Co. v. Culkin, 8 Cir., 1952, 197 F.2d 981.

■ The court has carefully considered the evidence and is not convinced of a single situation in which an employee in this case engaged in principal activities without receiving compensation therefor. In this connection it should be mentioned that ordinarily the following activities are considered preliminary or postliminary and not principal: (1) walking, riding or traveling to and from the actual place of performance of the principal activities regardless of whether such activities occur before or after the employee has checked in or out; (2) checking in or out; (3) washing or taking showers; and (4) changing clothes. For an excellent discussion of the meaning of the terms "preliminary", "postliminary" and "principal", as those terms modify the term "activity" see the enlightening opinion of Judge Delehant in McComb v. C. A. Swanson & Sons, D.C.Neb.1948, 77 F. Supp. 716.

Although the evidence discloses that in some situations the plaintiffs were not compensated for preliminary and postliminary activities, the evidence does not convince the court that there was in existence any contract, custom or practice to pay for such activities; consequently recovery therefor in this action must be denied. United States Cartridge Company v. Powell, 8 Cir., 1950, 185 F. 2d 67; Bonner v. Elizabeth Arden, Inc., 2 Cir., 1949, 177 F.2d 703; Battaglia v. General Motors Corporation, 2 Cir., 1948, 169 F.2d 254; Lasater v. Hercules Powder Co., 6 Cir., 1948, 171 F.2d 263.

The method of paying the firemen under the two-platoon system was perfectly appropriate and they received full compensation for all hours worked. Central Missouri Tel. Co. v. Conwell, 8 Cir., 1948, 170 F.2d 641; Rokey v. Day & Zimmerman, 8 Cir., 1946, 157 F.2d 734.

The safety inspectors and the sergeants of the guards were exempt from the wage-hour provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 213 (a); 29 C.F.R. (1949 Ed.) §§ 541.2–541.3.

For the reasons stated, the claims of the plaintiffs should be denied. Counsel for defendant shall prepare and submit for approval the appropriate judgments to be entered in accordance with this memorandum.