Víctor López Figueroa, demandante, recurrente y recurrido, *v.* Alfonso Valdés, demandado, recurrido y recurrente.

*Números:* R-64-76, R-64-88    *Resueltos:* 31 de marzo de 1967

*Luis M. Román Pérez,* abogado del recurrente y recurrido; *Pieras & Martín,* abogados del recurrido y recurrente.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos, Santana Becerra y Dávila.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El obrero Víctor López Figueroa presentó ante la Sala de San Juan del Tribunal Superior una demanda contra su patrono Alfonso Valdés, en la cual, en síntesis expuso: Que como celador o guardián de una mansión ubicada en la Calle Taft de Santurce, propiedad de Valdés trabajó desde 1954 hasta 1961, "día y noche, incluyendo domingos y días feriados, los siete días de la semana, los 30 días del mes y los 365 del año, *con la exclusión de las horas que usaba para dormir,* asearse y tomar alimentos", devengando un salario mensual de $60; que la casa que custodiaba nunca fue ocupada por familia alguna, "habiendo dentro de ella muebles y enseres de hogar de gran valor", que pactó con su patrono que disfrutaría anualmente de 15 días de vacaciones; trabajó 31,000 horas extras sin recibir paga por ellas y no se le concedieron vacaciones, por todo lo cual le adeudaba su patrono $20,080.

Pidió sentencia a su favor por esa cantidad y por una suma igual como penalidad impuesta por ley, más costas y honorarios de abogados.

Contestó el patrono Valdés esa demanda negando todas sus alegaciones y aduciendo varias defensas especiales, entre

ellas, que López Figueroa no era un empleado "según dicho término se define por la Ley 379 del 5 de mayo de 1948", que debido a la naturaleza del empleo del demandante no tenía derecho a horas extras, vacaciones y séptimo día de acuerdo con las leyes vigentes y que, si fuese tal empleado, le había pagado y compensado por todo el trabajo realizado por él, incluyendo horas extras. Interpuso otras defensas que ni se debatieron ni se resolvieron por el tribunal de instancia.

Fue el pleito a juicio. Ambas partes presentaron evidencia testifical. Por el demandante declararon Ramón Pagán Boria, Williams Romero Martínez y el propio reclamente. El demandado sólo ofreció su propio testimonio.

Se falló el 27 de febrero de 1964. Las determinaciones sobre los hechos del tribunal a quo son las siguientes:

## "Conclusiones de Hechos

1. El señor Alfonso Valdés, era propietario de una mansión ubicada en la Calle Taft Núm. 1 de Santurce, Puerto Rico. Esta residencia había pertenecido a los padres del señor Valdés y en ella residió la madre, hasta la fecha de su fallecimiento. El edificio se encuentra enclavado en un solar de aproximadamente tres cuerdas que colinda con el Océano Atlántico por su parte Norte. Además del edificio principal en el solar hay otras estructuras que tradicionalmente han sido utilizadas para dar alojamiento a los empleados de servicio doméstico.

2. Los terrenos de esta mansión siempre estuvieron dedicados a jardín, una parte sembrada de grama y el resto con plantas ornamentales y árboles.

3. El señor Valdés conoció al querellante varios años antes de iniciarse esta acción, cuando éste prestaba servicios como jardinero para la señora madre del aquí querellado.

4. Una vez muerta su señora madre el querellado adquirió en pública subasta la mansión que nos ocupa mediante escritura otorgada por el alguacil del Tribunal en el año 1953. Al adquirir esta propiedad los jardines de la misma estaban en perfecto estado de conservación.

5. Para el mes de marzo de 1954 y recordando que el querellante Víctor López había trabajado en una ocasión como jardinero en la casa, el querellado lo mandó a buscar y le ofreció trabajo como tal. Se convino en pagarle un salario de $60.00 mensuales y también se le brindó alojamiento en la casa de servicio de la mansión. Además de la labor de jardinero el señor Valdés esperaba que el querellante le cuidase la propiedad ya que ésta se encontraba sola la mayor parte del tiempo. Así lo entendió también el querellante por lo que concluímos que como cuestión de hecho que Víctor López prestó servicios como jardinero, celador y encargado de la propiedad del señor Valdés, en la Calle Taft Núm. 1 de Santurce.

6. Para la fecha en que el querellante Víctor López empezó a prestar servicios para el querellado éste residía en la ciudad de Mayagüez en compañía de su familia. La casa de la Calle Taft estaba completamente amueblada y era utilizada por el señor Valdés cuando visitaba la ciudad de San Juan. En esas ocasiones, hecho que ocurría tres o cuatro veces al mes, acostumbrada dormir en la casa y se paseaba por los jardines, tanto para recreo como por valor sentimental que estos representaban para él. En ocasiones también ocupaba la casa en compañía de su esposa. Tenía una empleada que aunque no residía en los terrenos de la mansión se ocupaba de la limpieza y el cuidado del equipo que había dentro de la casa y recogía la cama que usaba el señor Valdés cuando dormía en el edificio.

7. El señor Alfonso Valdés utilizó esta residencia en la forma antes descrita hasta diciembre del año 1959, fecha en que se mudó desde Mayagüez, para otra mansión que hizo construir en el sitio conocido como Caparra. La propiedad de la Calle Taft fue vendida el 14 de julio de 1959. [El año correcto es 1960.]

8. El querellante en este caso comenzaba sus labores aproximadamente a las siete de la mañana y continuaba trabajando hasta las once de la noche, hora en que se acostaba. Hacía un paréntesis al mediodía como de una hora para almorzar y por la tarde tomaba otra hora para comer."

Debido a que en ellas se determinan hechos adicionales, transcribimos a continuación las conclusiones de derecho:

242

*"Conclusiones de Derecho*

1. El título 29 LPRA, Sec. 285 es aplicable a los hechos de este caso. Dicha sección legal en la parte pertinente lee así:

'Las disposiciones de la Sec. 271 y 288 de este Título no se aplicarán a personas empleadas en el servicio doméstico; disponiéndose, sin embargo, que estos tendrán derecho a un día de descanso por cada seis de trabajo.'

2. Son empleados del servicio doméstico aquellos cuyas actividades y esfuerzos están dirigidos al cuidado, mantenimiento y servicio de la casa para el placer, comodidad y satisfacción de las necesidades de los que la ocupan, de acuerdo con el nivel social y económico de estos. Antiguamente se exigía que el empleado viviese dentro de la casa. En épocas más recientes esta limitación fue abandonada, basatando con que viviese dentro de los premises de la casa. Creemos, considerando las realidades económicas y sociales de la vida moderna que, el sitio donde vive el empleado carece de importancia. Su clasificación la determina la naturaleza de su trabajo unido al carácter permanente del mismo. Un jardinero que además actúa como celador (caretaker) ha sido considerado como un empleado de servicio doméstico. *Anderson* v. *Ueland*, 267 N.H. 517, *Jack* v. *Belin's Estate*, 27 Atl.2d, 455; *Cotto* v. *Plant*, 137 Atl. 764; *In re Savin's Estate*, 26 S.2d 270.

Un ciudadano, dependiendo de sus necesidades y/o sus gustos puede tener más de una casa. Si le da uso como vivienda a esas casas, aunque sea esporádicamente, los empleados de todas y cada una de ellas que reúnan las condiciones antes indicadas son empleados de servicio doméstico. *In Re Savin's Estate,* supra.

Como habíamos indicado en nuestras conclusiones de hecho, el señor Valdés, aunque residía en Mayagüez, tenía la casa de la Calle Taft amueblada, tenía una empleada que la limpiaba y conservaba por dentro y a ella iba y ella dormía cuando venía a San Juan. En tales condiciones su jardinero-celador era un empleado de servicio doméstico. Este estado de hechos duró hasta diciembre de 1959. En esa fecha el señor Valdés se trasladó a vivir al área metropolitana. Ya no alega ni pretende darle uso como vivienda a la casa de la Calle Taft, no es lógico ni razonable que lo hiciese. La casa de la Calle Taft deja de ser

el sitio donde el querellado vivía aunque fuese por muy cortos períodos para convertirse en un edificio más de su propiedad que no guarda relación alguna con las comodidades y servicios que el dueño espera encontrar en el sitio donde vive. Por tanto, a partir del 1ro de enero de 1960 el querellante dejó de ser un empleado de servicio doméstico y está cubierto por las disposiciones del T. 29 LPRA sec. 271 a 288.

3. El querellante, mientras fue empleado del servicio doméstico tenía derecho a un día de descanso por cada seis días de trabajo. No habiendo disfrutado de dicho día de descanso, su patrono viene obligado a indemnizarlo a un tipo de compensación doble. Para determinar el tipo sencillo debe dividirse su salario mensual por treinta días que tiene el mes. Desde marzo de 1954 a diciembre de 1959, ambos meses inclusive el querellante trabajó durante trescientos cuatro (304) días libres que compensados a base de el doble de su salario diario, a saber, cuatro dólares ($4.00) reflejan que el querellado adeuda al querellante por tal concepto, $1,216.00.

4. Del 1ro de enero al 13 de julio de 1960 el querellante trabajó 168 días durante catorce horas diarias, teniendo por tanto derecho a recibir el doble como compensación por las seis horas extraordinarias que trabajó diariamente. Dicha compensación se determina dividiendo su salario mensual por 208 horas regulares de trabajo que hay en el mes. Tal operación demuestra que el salario del querellante era de $0.288 por hora. Habiendo trabajado 1008 horas extras, el querellado le adeuda $597.00. Durante el mismo período trabajó catorce horas diarias durante veintiocho días libres, cuyas catorce horas deben ser compensadas a tipo doble para un total de $228.67."

El 19 de marzo siguiente el Tribunal de instancia dictó sentencia enmendada condenando al querellado "a pagar al querellante la suma de $2,041.67, cantidad que adeuda al demandante por concepto de horas extras trabajadas en exceso, más una cantidad igual por concepto de penalidad para un gran total de $4,089.34, más $800 por concepto de honorarios de abogado."

De ese fallo solicitó revisión el obrero y quince días después de haber presentado éste su recurso, el querellado

interpuso el suyo. A la luz de los respectivos apuntamientos, decidimos en ambos recursos revisar la sentencia final.

## I

En primer término dispondremos del recurso del obrero. Señala la comisión de cinco errores que los podemos resumir así: (a) al determinarse que el demandante, hasta julio de 1959, fue un empleado al servicio doméstico de Alfonso Valdés, a los efectos de la Ley Núm. 379 de 1948; (b) al fijar el monto de la compensación y (c) al no conceder compensación por *"las horas que el demandante dormía* puesto que se le había limitado su libertad de acción y tenía que residir y mantenerse dentro de la propiedad del demandado, por tanto era también tiempo trabajado."

### (a)

Estudiada la primera cuestión a la luz de los hechos y circunstancias concurrentes, a nuestro juicio, Víctor López Figueroa no era una persona empleada para el servicio doméstico de Alfonso Valdés. Era un obrero que, mediante paga, estaba encargado solamente del celo, vigilancia, custodia y cuidado de una de las varias propiedades urbanas de su patrono, compuesta por un extenso solar con una casa amueblada, pero en la cual no habitaba familia o persona alguna.

La Ley Núm. 379 de 15 de mayo de 1948, que establece la jornada de trabajo y el pago de un tipo doble de salario por las horas trabajadas en exceso de la jornada legal, en su Art. 16 excluye de sus disposiciones "a personas empleadas en el servicio doméstico"; su Art. 19, dedicado a definiciones de palabras y frases, tales como "empleado, patrono, salario, ocupación y contrato de trabajo", no define "servicio doméstico."

■ [El Diccionario de la Lengua Española define el término "doméstico" así:

"Doméstico (L. Domesticus, de domus, casa). Adj. Perteneciente a la casa u hogar . . . . Dícese del criado que sirve en una casa."]

El contacto entre el amo o señor y el criado o sirviente, que es predominantemente familiar, se transforma en una relación laboral o de trabajo.

Del texto del Art. 1474 de nuestro Código Civil se desprende que debe entenderse por criado doméstico al "empleado para el servicio doméstico, ya sea para las atenciones personales del cabeza de familia o en general para el servicio de ésta."

■ Comentando sobre la materia, Castán, en su tomo cuarto, pág. 475, ed. 8va. (1956), de su obra *Derecho Civil Español, Común y Foral,* nos dice:

"Servicios domésticos: Caracterízase este contrato por la índole personal y familiar de los servicios que son su objeto y por la ordinaria convivencia que supone entre sus dos miembros, llamados amo y criado."

La ley española de 1944 que regula el contrato de trabajo, en su Art. 2, apartado C, dice que se entiende por servicio doméstico "el que se presta mediante jornal, sueldo, salario o remuneración de otro género o sin ella, y que sea contratado, no por un patrono, sino por un amo de casa o morada particular, al servicio exclusivo del contratante, de su familia o dependientes, bien se albergue en el domicilio del amo o fuera de él."

El Código Civil de Luisiana define en su Art. 3205 al sirviente o doméstico en la siguiente forma: "Sirvientes o domésticos son aquéllos que reciben salarios y permanecen en la casa de la persona que les paga y emplea para su servi-

cio o el de su familia; tales son los criados, lacayos, cocineros, mayordomos y otros que residen en la casa."

■ Para determinar si una persona está empleada en el servicio doméstico es necesario examinar la naturaleza del trabajo que rinde si el mismo se desarrolla en el hogar del principal, o fuera de él pero en relación con el mismo y si su labor principal es necesaria o deseable para servir a las necesidades y bienestar familiares, o al manejo o disfrute de la casa o morada. (¹)

Cuando la morada de la familia dispone de algún terreno destinado al cultivo de plantas deleitosas por sus flores, matices o fragancia, con árboles o arbustos de sombra y el señor de la casa toma a su servicio, mediante paga, para que se dedique a atenderlo debidamente, a una persona que por oficio cuida y cultiva jardines o tiene suficientes conocimientos de ese arte, sin ánimo de lucro pecuniario, para el exclusivo placer espiritual de la familia, amigos y hasta visitantes, no debe haber duda de que ese jardinero está empleado en el servicio doméstico del señor de la morada. (²)

---

(1) La jurisprudencia continental, especialmente la relacionada con la materia de compensaciones por accidentes del trabajo, apoya este criterio. Véanse, *Graham* v. *Commercial Credit Co.*, 200 A.2d 828, 830; *In re Savin's Estate*, 26 A.2d 270, 273; *In re De Forest's Estate*, 15 N.Y.S.2d 466, 469; *In re Johnson's Estate*, 282 N.Y.S. 806; *Wiseman* v. *Phipps*, 28 N.Y.S.2d 971, 973.

(2) Dijimos en *Bustelo* v. *Comisión Industrial*, 85 D.P.R. 582, 591 (1962):

"Por otro lado, Ortega fue contratado por un amo de casa, que no perseguía con ello fin de lucro, mediante un sueldo mensual, para realizar la labor manual de arreglar dos veces al mes, el jardín de su hogar. Su trabajo llevaba a la familia que allí moraba, el placer y la satisfacción que ofrece todo jardín bien cultivado y atendido. En esas condiciones en todas las ocasiones en que se encontraba en su labor de jardinero en la casa de Bustelo, era un empleado dedicado al servicio doméstico de esa casa, aun cuando se albergara fuera de ella, al igual que los demás sirvientes y criados de su hogar, dentro del amplio o lato sentido del término 'servicio doméstico.' Véanse *Jack* v. *Belin's Estate*, 27 A.2d 455, 457

Pero tampoco debe existir duda alguna de que no está al servicio doméstico de nadie, el jardinero empleado para atender un jardín cuyas flores o plantas ornamentales se cultivan expresamente para su venta al público, o para atender el jardín de un hotel o de una institución comercial o industrial, sin relación alguna con un hogar o morada. [3]

■ En su conclusión de hechos Núm. 5, expuso el tribunal de instancia, que para el mes de marzo de 1954 Valdés mandó a buscar a López Figueroa y le ofreció trabajo como jardinero por $60.00 mensuales, más alojamiento en la propiedad. También expuso: "Además de la labor de jardinero el señor Valdés esperaba que el querellante *le cuidase la propiedad* ya que ésta se *encontraba sola la mayor parte del tiempo*. Así lo entendió también el querellante por lo que concluímos como cuestión de hecho que Víctor López Figueroa prestó servicios como jardinero, celador y encargado *de la propiedad* del señor Valdés, en la Calle Taft Núm. 1 de Santurce." (Énfasis suplido.)

_____

(Pa. Super. 1942); *Anderson* v. *Ueland*, 197 Minn. 518 (1936) 267 N.W. 517, 518; Schneider's *Workmen's Compensation*, Vol. 2, 3rd Ed., Sec. 627, y Suplemento de 1958, Vol. 1, pág. 498."

(3) En *Ocasio Calo* v. *Fajardo Sugar Co.*, 88 D.P.R. 572 (1963), se trataba del pago de los servicios rendidos por un empleado de una entidad industrial y agrícola, que por muchos años le trabajó como jardinero. La cuestión a resolver era si le debía pagar a base del salario mínimo agrícola o a base del salario mínimo correspondiente a la fase industrial del negocio azucarero del patrono. Resolvimos que prevalecía el de la fase industrial, no obstante tratarse de un jardinero. En parte de la opinión manifestamos:

"Las empresas son una unidad de funcionamiento. En este respecto, no es difícil comprender la razón por la cual es una norma tradicional en la industria azucarera el proveerle casas a sus administradores, técnicos y altos ejecutivos en las inmediaciones del molino, como una necesidad de la empresa dada la naturaleza de su funcionamiento. Y se explica que la ortiga, las zarzas, el yerbajo o la maya, aun la del Poeta, 'arropás de cundiamores' no impidan el libre acceso a esas residencias, así como el que sus alrededores se mantengan en aquel grado de limpieza y buena presentación que demanda la jerarquía de sus moradores. El querellante en este sentido era un empleado de conservación como cualquier otro."

Nótese que el Tribunal sentenciador forma juicio definitivo respecto a que "la propiedad . . . se encontraba sola la mayor parte del tiempo" y que el querellante prestó servicios en "la propiedad del señor Valdés en la Calle Taft Núm. 1 de Santurce." Nunca dice, ni mucho menos resuelve, que esa mansión constituyera la casa abierta o de vivienda, residencia, morada, hogar, domicilio, casa de campo o centro familiar del patrono. Al contrario, en la Núm. 6, concluye: "Para la fecha en que el querellante Víctor López empezó a prestar servicios para el querellado éste residía *en la ciudad de Mayagüez en compañía de su familia*."

Conforme al testimonio del propio patrono demandado, esa propiedad perteneció a su señora madre en parte. En 1948 falleció dicha señora. En 1954 adquirió Valdés la propiedad en pública subasta. Cuando se preguntó a éste qué planes tenía en relación con la propiedad, contestó:

"Los planes míos eran reconstruirla, arrendarla, remodelarla o edificar en un solar que yo tenía en Caparra, . . . estaba pensando dónde edificar, si en Caparra o reconstruir esa, hacerla moderna." (T.E. pág. 96.)

Al interrogársele "Durante los años que usted poseyó esa casa de la Calle Taft qué uso le dio, si alguno?, contestó: "Bueno, *yo no vivía en la casa*, yo vivía en el Castillo de Mayagüez, una casa que tenía allí. . . ." (T.E. págs. 96–97.) (Énfasis suplido.)

Declaró el querellado, además, que "mis hijas estaban en Estados Unidos y mi mujer no venía mucho a San Juan"; que venía a San Juan "un promedio de dos o tres veces por mes. Y cuando venía mi señora, debo admitir y decir la verdad, muchas veces nos íbamos al Hilton porque era mucha más comodidad para ella, pero muchas veces nos quedábamos en la casa." (T.E. pág. 98.)

Respecto al querellante y a la persona que únicamente lo atendía cuando él pernoctaba en la casa, declaró Valdés que el querellante no tenía llave de la casa y:

*"Puedo añadir que él nunca tuvo que entrar a la casa para nada* y yo tenía una señora que era la secretaria antigua de papá, Margarita Balzac, *que era la que entraba para hacerme la cama y de cuando en cuando limpiar la casa por dentro,* que falleció hay como un mes." (T.E. pág. 104.) (Énfasis suplido.)

Al decidir Valdés trasladar su morada a San Juan, olvidó sus planes de arrendar o construir una residencia moderna en su propiedad de la Calle Taft, (había declarado que "la casa de la Calle Taft no era muy apropiada para vivirla, que estuve unos cuantos años pensando en reabilitarla [*sic*]" y que no se cuidaba con esmero) para edificar y establecerla en el solar de Villa Caparra. (T.E. pág. 131.)

Cuando se le pregunta qué planes tuvo, de ahí en adelante, para la propiedad de la Calle Taft, contestó:

"Entonces yo pensaba venderla y naturalmente quise continuar manteniendo el jardín en buen estado porque una casa como aquella de grande, pues repito, valía mucho, mucho, mucho más (con) el jardín cuidado que sin cuidar." (T.E. pág. 106.)

La propiedad fue vendida "a Fullana" el 14 de julio de 1960. Los muebles guardados en la casa, según cálculo de Valdés, tendrían un valor de tres a cuatro mil dólares. La propiedad le había costado $65,000.00 en 1954. No recordaba en cuánto la había revendido a Fullana.([4])

Las visitas ocasionales de Valdés a su propiedad de la Calle Taft, hechas con motivo de sus negocios e intereses en la zona metropolitana, el estado de descuido en que mantenía

---

([4]) En moción de reconsideración, ante el Tribunal Superior, que en parte tuvo buen éxito, sostenía el querellante que su patrono la compró en esa suma, como había declarado, pero que "especuló con ella hasta que la vendió en una suma de más de medio millón de dólares . . .". Tal afirmación la repite en la solicitud del recurso.

esa edificación, sus deseos de arrendarla o destruirla y hacer en la parcela de tres cuerdas la mansión que correspondía disfrutar una familia de la elevada condición social y económica como la suya, sus planes para venderla con un jardín que la hiciera atractiva para un desarrollo residencial en una de las zonas urbanas más costosas en Puerto Rico, el tener y conservar el hogar o morada de su familia en Mayagüez y luego en Villa Caparra, el contar Valdés únicamente con la señora Margarita Balzac para arreglarle la cama y limpiar la casa en las contadas ocasiones en que él pernoctó en ella, el no tener el querellante llave de la casa ni autoridad siquiera para entrar en ella hasta el punto que nunca entró en ella, constituyen fuertes razones para descartar la idea de que Víctor López Figueroa estuviera alguna vez allí empleado para el servicio doméstico, bien para las atenciones personales del cabeza de familia o en general para el servicio de ésta, como previene el citado Art. 1474.

Aceptando que López Figueroa, no hubiera trabajado además como "celador y encargado de la propiedad del señor Valdés", como dijo el tribunal de instancia, sino exclusivamente, como jardinero, según sostiene el patrono en su alegato, su carácter de tal jardinero no lo situaría *ipso facto*, en el estado de sirviente o criado, del que lo empleó y pagó sus servicios, de su familia o dependientes. El arte de la jardinería y el oficio de jardinero no están obligados necesariamente a desarrollarse o practicarse en el ambiente doméstico.

Él nunca rindió labor en los jardines del "Castillo", nombre dado a la anterior residencia familiar de su patrono en Mayagüez. Ni después en Villa Caparra, nueva morada fija, habitual y continua de Valdés. Es más, durante todos esos años éste tenía un jardinero en su hogar de Mayagüez, y así lo declaró cuando en el juicio se refería a las vacaciones que le había dado al querellante:

". . . recuerdo lo de las vacaciones porque tenía que convencer al empleado del Castillo, al jardinero, de que viniese a San Juan a hacerse cargo del jardín acá." (T.E. pág. 138.) (5)

El haber recibido alojamiento temporal en las dependencias del viejo edificio hechas para uso de la servidumbre, en donde a él no se le proveía de alimentación ni de otras facilidades de un hogar, como ropas y atenciones médicas en caso de enfermedad, no es factor constitutivo, por sí solo, del estado de empleado doméstico. Ello fue una condición accesoria al contrato de trabajo, por razón del mismo, propuesta por el empleado y aceptada por el patrono. Como dijo el juez ". . . además le pidió un sitio para vivir allí y . . . Valdés aceptó eso muy gustoso, . . . creía que era beneficioso." (T.E. pág. 121.) Ninguna relación tuvo esa circunstancia respecto a las atenciones personales de su patrono o a las necesidades de la familia de éste. (6)

Con lo que hasta aquí hemos dicho, apoyándonos en las conclusiones del tribunal recurrido, en el testimonio del patrono demandado y en el supuesto de que López Figueroa sólo hubiera rendido una faena de jardinero, no podemos estimar corporificada, con todas sus características esenciales que la integran, la figura del empleado doméstico a que hace referencia la Ley Núm. 379 de 1948. Se trata de una legislación cuyo principal objetivo es la efectiva protección de la salud, seguridad y vida de los trabajadores, mediante la eliminación de condiciones de explotación del trabajador a

---

(5) Ese jardinero de la familia Valdés no fue traído a declarar. Ni se trajo deposición alguna de Margarita Balzac. Ni se trajo como testigo a Antonio, chofer de Valdés que fue a buscar al querellante en 1954 para trabajar.

(6) Declaró Valdés:

"R. Yo nunca le hablé de la casa ni de los muebles, es más él nunca vio la casa por dentro. Lo oí decir ahora que entró con mi señora, yo desconocía eso. Ni le pedí nunca que lo hiciera, si se hubiera atrevido le hubiese enseñado los muebles y tampoco tenía; llave de la casa." (T.E. pág. 119.)

base de jornadas excesivas, (⁷) con una tajante disposición de exclusión, que expresamente priva de esa protección a seres humanos a quienes los agobios de la vida les ha impedido elevarse sobre el nivel de la servidumbre doméstica.

Esa desigualdad en términos de protección y beneficios, entre el empleado plenamente amparado por la Ley Núm. 379 y el doméstico, sirviente o criado, abandonado a su suerte, sujeta a la infinita variedad de condiciones humanas, se supone equitativamente balanceada con aquellas facilidades o beneficios intangibles que a éstos, y a veces a sus dependientes, en adición a su salario, les puede brindar la morada de un buen padre de familia, tales como albergue cómodo y seguro, comidas sanas, ropas adecuadas, servicios médicos y medicinas, empleo vitalicio, trato cristiano, mejoramiento intelectual, recreación, uso de propiedades y convivencia familiar.

El tribunal de instancia califica al jardinero-celador querellante desde el 30 de marzo de 1954 hasta el 31 de diciembre de 1959, como sirviente o criado al servicio doméstico de su señor Valdés, sin derecho alguno a compensación por las cincuenta horas extras de labor que semanalmente realizó, concediéndole compensación sólo por los días de descanso en que también trabajó. Empero, del 1ro. de enero al 14 de julio de 1960, al mismo jardinero-celador le atribuye el estado de empleado de su patrono Valdés, protegido plenamente por la Ley Núm. 379, con indiscutible derecho al cobro, a tipo doble, de esas cincuenta horas extras semanales.

Ello, aparentemente, se debe a que según el tribunal a quo, en diciembre de 1959 "el señor Valdés se trasladó a vivir al área metropolitana . . . y ya no alega ni pretende darle uso como vivienda a la casa de la Calle Taft. . . . La casa de la Calle Taft deja de ser el sitio donde el querellado

---

(⁷) Durante los años 1954 a 1960, López Figueroa realizó una labor de 14 horas diarias.

vivía aunque fuese por muy cortos períodos para convertirse en un edificio más de su propiedad que no guarda relación alguna con las comodidades y servicios que el dueño espera encontrar en el sitio donde vive."—Véase último párrafo, Conclusión de Derecho, Núm. 3, pág. — de esta opinión.

Volvemos a exponer que esa conclusión del tribunal de instancia, en su versión restringida a esos primeros seis meses del año 1960, no está sostenida en forma alguna por la prueba de ambas partes. Está, en contrario, respecto a todo el tiempo en que el obrero trabajó, negada o refutada por el propio patrono querellado en la forma clara que expusimos en el tercer párrafo de la página — que antecede. Refiriéndose Valdés a todos los años en que fue dueño de la casa dijo: ". . . *yo no vivía en la casa, yo vivía en el Castillo de Mayagüez, una casa que tenía allí . . . .*" (Énfasis suplido.)

Entre esos aparentes y arbitrarios dos períodos, no hay cambio alguno en la naturaleza, sitio, condiciones y horas de trabajo, propósitos de la labor, y circunstancia fundamental de no existir allí familia alguna constituida del patrono. Es el mismo jardinero-celador, como dijo el tribunal a quo, que se levanta a las seis de la mañana a celar el viejo edificio y sus alrededores, y se acuesta a las once de la noche luego de una jornada de 14 horas consecutivas. "Él generalmente se portó bien", declaró Valdés. (T.E. pág. 137.)

Por otro lado, el querellante aportó prueba oral—declaraciones de Ramón Pagán Boria, William Romero Martínez y la de él—que tendió fuertemente a sostener su tesis de que no fue contratado como jardinero, sino como celador, aunque de vez en cuando limpiaba el solar a los fines de eliminar la maleza que allí crecía para poder realizar mejor su labor de vigilancia ya que los jardines "estaban abandonados, hecho montes." (T.E. pág. 27.) Los tres testigos afirmaron

que la casa de la Calle Taft "estaba deshabitàda, nunca ha vivido nadie"; Valdés no le daba uso alguno, "él venía entre tiempo a verla nada más."

La Ley Núm. 379, en su Art. 19, no solamente contempla la labor específicamente convenida, sino aquella que se tolere o permita que se realice. El término "ocupación" incluye todo servicio, obra, labor, prestación o trabajo que un empleado realice para su patrono.

### (b)

Contrario a lo prevenido en el Árt. 4(e) de la Ley Núm. 379, el tribunal recurrido sólo concedió el pago las primeras ocho de las catorce horas de labor de cada supuesto día de descanso. Por ello resulta cometido el segundo error señalado por el querellante.

Desde el 30 de marzo de 1954 al 14 de julio de 1960— 6 años, 3 meses, 14 días—López Figueroa trabajó 2,297 días. Éstos se separan en 1,969 regulares, en los que trabajó 6 horas extras, con un total de 11,814 horas extras y en 328 séptimos días o días de descanso, en los que también trabajó 14 horas extras por día, con otro total de 4,592 horas extras. La suma de todas esas horas extras alcanza a 16,406. Pagadas a 0.576 la hora—que es el tipo doble—debe satisfacerse por esas 16,406 horas extras, la cantidad de $9,449.86. Con la suma igual que debe pagar el patrono, como penalidad legal por haber dado causa a la reclamación judicial, el principal a pagar asciende a $18,499.70.

### (c)

No procede, bajo las circunstancias del caso, conceder compensación por las horas en que el demandante dormía. En parte de su demanda expuso López Figueroa:

"3. Que trabajó día y noche, incluyendo domingo y días feriados, los siete días de la semana, los 30 días del mes y los

365 días del año, *con la exclusión de las horas que usaba para dormir, asearse y tomar alimentos.*" (Énfasis suplido.)

Es en su moción de reconsideración ante el tribunal recurrido donde pretende por primera vez que se le pague por las horas que dedicó al aseo, a su alimentación y al sueño, fundado en que en todo momento venía "obligado a permanecer" en la propiedad. En parte de esa moción se expresa así:

"Por lo tanto el Tribunal debió concluir que este obrero tenía derecho aún a las horas que usaba para dormir, aun cuando *esas horas no se alegaron por el querellante por creer injusto cobrar las horas que dormía* aunque en derecho debiese pagársele." (Énfasis suplido.)

■ El querellante manifestó que nunca había recibido órdenes de su patrono de no abandonar la propiedad ni de día ni de noche; (T.E. pág. 11) de la misma él salía libremente a tomar alimentos.

Se ha reconocido a ciertos períodos de inactividad dentro de la faena laboral, la característica o naturaleza de períodos de trabajo compensándose como tal, debido a que en ellos el empleado no tiene libertad para dedicarse a aquellas labores que desee y debe estar alerta, preparado y sujeto a ser llamado para trabajar.

■ Pero en este sentido, no puede asegurarse que exista una norma fija para determinar cuándo ese período de espera es compensable, y es necesario considerar las circunstancias de cada caso en conjunto, como resolvimos en *Sucn. Meléndez* v. *Central San Vicente,* 86 D.P.R. 398, 402, (1962).

En *Armour and Company* v. *Wantock,* 323 U.S. 126 y *Skidmore* v. *Swift,* 323 U.S. 134, decididos el 4 de diciembre de 1944, se resolvió que las horas usualmente dedicadas a dormir no son compensables, a pesar de que las comprendidas en el período de espera sí lo son.

En *Rokey* v. *Day and Zimmermann, Inc.*, 157 F.2d 734, *cert.* den. 330 U.S. 842, la corte dijo a la página 737:

"Cuando en los terrenos del patrono se permite un número amplio de horas consecutivas de sueño, a pesar de que el empleado esté sujeto a ser llamado a trabajar, trabajo por el cual se le paga, y esas llamadas son ocasionales pero poco frecuentes, mientras duerme no se encuentra trabajando. Está durmiendo de la misma manera que si estuviera durmiendo normalmente en su casa o en un hotel."

En *Bowers* v. *Remington Rand, Inc.*, 159 F.2d 114, *cert.* den. 330 U.S. 843, la corte señaló que los empleados habían acordado dormir en la planta, sujetos a ser llamados, y que el período de sueño no constituía tiempo de trabajo.

Otra jurisprudencia que contiene decisiones similares: *Bell* v. *Porter*, 159 F.2d 117, *cert.* den. 330 U.S. 813; *Buckner* v. *Armour and Co.*, 53 F.Supp. 1022; *Bridgeman* v. *Ford, Bacon and Davis, Inc.*, 64 F.Supp. 1006; *McGregor* v. *Trojan Powder Co.*, 11 CCH Lab. Cas. 63:465; *Plummer* v. *Harvester War Depot, Inc.*, 70 F.Supp. 495; *McLaughlin* v. *Todd and Brown, Inc.*, 15 CCH Lab. Cas. 64:606; *Ciemnoczolowski* v. *Q. O. Ordnance Corp.*, 119 F.Supp. 793 y otros.

La poca jurisprudencia en la que se ha decidido que las horas utilizadas para dormir son compensables como horas de trabajo ha hecho la distinción, bien en cuanto al tipo de contrato de trabajo celebrado, o bien en cuanto a si la persona tenía una prohibición expresa y total de abandonar el lugar.

Por otro lado se ha resuelto respecto a guardias o celadores nocturnos a quienes se les requiere permanecer en los terrenos del patrono por un período adicional y en parte del cual les está permitido dormir, que el período de sueño no es parte del período de trabajo. *Vandyke* v. *Bluefield Gas Co.*, 210 F.2d 620, *cert.* den., 347 U.S. 1014; *Neal* v. *Braughton*, 111 F.Supp. 775; *Perry* v. *George P. Livermore, Inc.*, 165 S.W.2d 782; *Johnson v. Dierks Lumber and Coal Co.*,

130 F.2d 115, en opinión concurrente de Stone, Juez de Circuito; *Muldowney* v. *Seaberg Elevator Company*, 39 F.Supp. 275.

La poca jurisprudencia en que se ha decidido que las horas utilizadas para dormir por guardias y celadores nocturnos son compensables como horas de trabajo, no tiene la más remota aplicación al caso de autos ya que se trata de situaciones muy especiales. Por ejemplo, un guardia que tenía que permanecer en los terrenos de una empresa durante *una huelga*, o un guardián *que dormitaba* mientras trabajaba. (Ver *Campbell* v. *Jones and L. Steel Corp.*, 70 F.Supp. 996; *Martin* v. *Graham Ship-By-Truck Co.*, 176 S.W.2d 842; *Aufiero* v. *E. A. Laboratories*, 271 App. Div. 1024, 69 N.Y.S.2d 217, entre otros.)

Empleados que tienen libertad de movimiento y que meramente pueden ser llamados, teniendo que informar dónde se les consigue, no se encuentran trabajando dentro del significado de la Ley Federal de Horas y Salarios. (Ver *Dumas* v. *King*, 157 F.2d 463 en un *dictum* a la página 466 y *Super-Cold Southwest Co.* v. *McBride*, 124 F.2d 90; y en nuestra jurisdicción, *Deyá* v. *Otis Elevator Co.*, 91 D.P.R. 669 (1965).

## II

Dispondremos a continuación del recurso del patrono. Por su parte sostiene que el Tribunal recurrido erró al concluir (1) que él esperaba que López Figueroa le cuidase la propiedad; (2) que éste prestó servicios como celador; (3) que el demandante trabajara de 7 de la mañana hasta las 11 de la noche; (4) que dejara de ser empleado de servicio doméstico a partir del 1ro. de enero de 1960; (5) que dicho demandante tenía derecho a un día de descanso por cada seis días de trabajo; (6) que no había disfrutado del día de descanso y (7) que el demandante trabajó horas extras a partir del 1ro. de enero de 1960.

El patrono recurrente ha sometido su recurso por los méritos del memorándum que presentó en apoyo de su solicitud de revisión, en el cual discute "todos los errores conjuntamente en tanto y en cuanto estos están dirigidos a un solo 'issue' . . . que el demandante además de ser jardinero . . . venía obligado a actuar de celador y . . . trabajaba 14 horas al día y los séptimos días."

Ninguno de tales errores fue cometido. En su mayoría se refieren a la apreciación de la prueba. Estima el patrono que ésta, en lo fundamental, era susceptible de una sola interpretación: la de que López Figueroa siempre actuó como un empleado al servicio doméstico de Valdés. Ya hemos expuesto las razones para no compartir tal criterio. La prueba practicada no revela ocasión alguna en que al llamado jardinero se le ocupara "para las atenciones personales del cabeza de familia o en general para el servicio de ésta", como previene el Art. 1474 de nuestro Código Civil, ni mucho menos que a partir de marzo de 1954 y hasta el 14 de julio de 1960, alguien tuviera una familia constituida en el viejo y descuidado caserón de la Calle Taft.

Sin embargo, quizá estemos de acuerdo con el cuarto punto, pero en el sentido de que López Figueroa jamás fue un empleado al servicio doméstico de Alfonso Valdés.

El problema aquí no envuelve realmente la determinación de si se tenía o no derecho a un día de descanso. Porque el obrero trabajó, como muy bien alegó, ". . . día y noche, incluyendo domingos y días feriados, los siete días de la semana, los 30 días del mes y los 365 del año . . .". La evidencia de ambos lados, si se aprecia en conjunto, no falla en así probarlo. La aportada sobre la naturaleza del trabajo realizado y las horas que tomó en su desempeño, no es increíble si tomamos en cuenta que el obrero era la única persona allí encargada del servicio de vigilancia, custodia y limpieza exterior de toda una propiedad de mucho valor,

radicada en una zona muy frecuentada, por el día y por la noche, por toda clase de personas. No es por otro lado imposible, que una persona pueda prestar esos servicios desde las 7 de la mañana hasta las 11 de la noche.

Se trata pues, de un obrero que trabaja 98 horas durante cada semana. Del total de esas 98 horas, 50 son horas extras de trabajo por disposición del Art. 4 (b) de la Ley Núm. 379. Todo patrono que emplee "o permita que trabaje" un empleado durante horas extras vendrá obligado a pagarle por cada hora extra un tipo de salario igual al doble del tipo convenido por las horas regulares, conforme al Art. 5 de la misma ley.

*Por todo lo expuesto se modificará la sentencia recurrida en el sentido de conceder al obrero recurrente y recurrido una compensación de $9,449.86, importe de las 16,406 horas extras de trabajo, más el pago de una suma igual por concepto de liquidación de daños y perjuicios, además de las costas, gastos y los honorarios de abogado ya fijados, conforme lo previene el Art. 13 de la Ley Núm. 379, y así modificada, se confirmará.*